UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ESTATE OF DIANE HELEN RAYMOND by the
Executor JOHN T. RAYMOND and JOHN T.
RAYMOND, individually,

v.

NO. 5:20-CV-00959-EGS

AMANDA R. LIEBERMAN, PA-C; ERRIN J.
HOFFMAN, M.D.; THE ALLENTOWN
SPECIALTY HOSPITAL d/b/a GOOD
SHEPHERD SPECIALTY HOSPITAL; LEHIGH
VALLEY HOSPITAL, INC.; *et al*.

**ORDER**

AND NOW, this _____ day of _____, 2021, upon consideration of the Motion for Summary Judgment of Defendant, The Allentown Specialty Hospital d/b/a Good Shepherd Specialty Hospital, and any response thereto, it is here by **ORDERED** that said Motion is **GRANTED**.

It is further **ORDERED** that judgment is entered in favor of Defendant, The Allentown Specialty Hospital d/b/a Good Shepherd Specialty Hospital, and against all other parties.

**BY THE COURT:**

_____

**EDWARD G. SMITH, J.**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ESTATE OF DIANE HELEN RAYMOND by the
Executor JOHN T. RAYMOND and JOHN T.
RAYMOND, individually,

v.

AMANDA R. LIEBERMAN, PA-C; ERRIN J.
HOFFMAN, M.D.; THE ALLENTOWN
SPECIALTY HOSPITAL d/b/a GOOD
SHEPHERD SPECIALTY HOSPITAL; LEHIGH
VALLEY HOSPITAL, INC.; *et al*.

NO. 5:20-CV-00959-EGS

**MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, THE ALLENTOWN
SPECIALTY HOSPITAL d/b/a GOOOD SHEPHERD SPECIALTY HOSPITAL**

Pursuant to Rule 56, Defendant, The Allentown Specialty Hospital d/b/a Good Shepherd

Specialty Hospital (hereinafter, "Good Shepherd"), by and through its undersigned counsel,

moves the Court to enter summary judgment in its favor.

This medical negligence case arises from a thoracentesis performed on Plaintiff, John T.

Raymond's late wife on March 8, 2018. It is undisputed that Mrs. Raymond had the procedure *at*

*Lehigh Valley Hospital-Muhlenberg* ("LVH-M") and that it was performed by Amanda

Lieberman, PA-C ("PA Lieberman"). It is undisputed that PA Lieberman was employed by

Medical Imaging of Lehigh Valley and worked at LVH-M. It is undisputed that PA Lieberman

was not an independent contractor of Good Shepherd. Accordingly, there is no evidence to

support a theory of negligence against Good Shepherd based on actual agency or vicarious

liability.

Similarly, there is no evidence to support a theory that PA Lieberman was an ostensible agent of Good Shepherd. There is no evidence that a reasonably prudent person would be justified in believing that the thoracentesis was performed by Good Shepherd or its agents. Good Shepherd is a separate and distinct entity from LVH-M. The facilities have separate electronic medical records, separate licenses, separate nursing staff, and separate policies and procedures. There is no evidence that the thoracentesis was advertised or otherwise represented as care being rendered by Good Shepherd or its agents.

Finally, there is no evidence that Good Shepherd was negligent or breached any duty. No expert states that the care provided by Good Shepherd was below the standard. For that reason and because Plaintiff did not witness the alleged negligent acts of PA Lieberman while they were performed, Plaintiffs' negligent infliction of emotional distress claim fails as a matter of law.

Good Shepherd incorporates by reference its Statement of Undisputed Material Facts and Brief in support of its motion. For the reasons set forth herein, Good Shepherd respectfully requests that the Court grant its motion and enter the proposed Order.

Respectfully submitted,

GERMAN, GALLAGHER & MURTAGH

Dated: October 18, 2021                By: /s/ *John P. Shusted*
                                            JOHN P. SHUSTED, ESQUIRE
                                            JACQUELINE E. CAMPBELL, ESQUIRE
                                            PA.I.D. 44675 / 306647
                                            200 S. Broad Street, Suite 500
                                            Philadelphia, PA 19103
                                            P: 215-875-4037 / 215-875-4015
                                            F: 215-732-4182
                                            E: shustedj@ggmfirm.com
                                               cambellj@ggmfirm.com
                                            Attorneys for Defendant, The Allentown
                                            Specialty Hospital d/b/a Good Shepherd
                                            Specialty Hospital

2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ESTATE OF DIANE HELEN RAYMOND by the Executor JOHN T. RAYMOND and JOHN T. RAYMOND, individually,<br><br>v.<br><br>AMANDA R. LIEBERMAN, PA-C; ERRIN J. HOFFMAN, M.D.; THE ALLENTOWN SPECIALTY HOSPITAL d/b/a GOOD SHEPHERD SPECIALTY HOSPITAL; LEHIGH VALLEY HOSPITAL, INC.; *et al*. | NO. 5:20-CV-00959-EGS |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, THE ALLENTOWN SPECIALTY HOSPITAL d/b/a GOOOD SHEPHERD SPECIALTY HOSPITAL**

Defendant, The Allentown Specialty Hospital d/b/a Good Shepherd Specialty Hospital (hereinafter, "Good Shepherd"), by and through its undersigned counsel, submits the following Statement of Undisputed Material Facts in support of their Motion for Summary Judgment and in compliance with the Court's Policies and Procedures.

1.      Plaintiffs' decedent, Diane Helen Raymond, was a patient at Good Shepherd and transferred to the Interventional Radiology department at *Lehigh Valley Hospital-Muhlenberg* ("LVH-M") on March 8, 2018, for a right thoracentesis. (*See* Deposition of Amanda Lieberman, PA-C attached as **Exhibit A**, at 101:13-21; 102:12-103:3).

2.      Carin Minchew, PA-C ("PA Minchew") obtained consent for the thoracentesis from Mrs. Raymond's husband, Plaintiff, John T. Raymond ("Plaintiff"), over the phone, because she was not able to communicate consent. (*See* Deposition of Carin Minchew, PA-C attached as **Exhibit B**, at 48:24 – 53:23; 64:3-7).

3

3.      PA Minchew is employed by Medical Imaging of Lehigh Valley and reports to work at LVH-M (*Id.*, at 17:4 – 18:25).

4.      In obtaining consent by phone, PA Minchew would identify herself and state, "I'm a physician assistant at Lehigh Valley Hospital;" she did that in this case. (*Id.*, at 51:17 – 53:23).

5.      The consent for the thoracentesis was documented on an LVH-M form:



(*Id.*, at 48:24 – 50:7 and Ex. 2; *see also* Lehigh Valley Hospital Radiology Consent for Surgery / Invasive Procedure attached as **Exhibit C**).

6.      Brandi McMillian, RN, an employee of Lehigh Valley Health Network, witnessed the verbal consent obtained by PA Minchew in the Interventional Radiology department at LVHM. *See* Deposition of Brandi McMillian, RN attached as **Exhibit D**, at 13:1-24; 18:2 – 21:23.

7.      The thoracentesis was performed by Defendant, Amanda Lieberman, PA-C ("PA Lieberman"); Defendant, Errin J. Hoffman, M.D. ("Dr. Hoffman"), was her supervising physician. (Ex. A, 101:13-21; 102:12-103:3; *see also* Deposition of Errin J. Hoffman, M.D. attached as **Exhibit E**, at 94:2-12).

8.     PA Lieberman was employed by Medical Imaging of Lehigh Valley at the time of the thoracentesis and performed procedures at LVH-M. (Ex. A, at 22:25 – 23:20; 29:24 – 30:4; 36:18 – 37:7).

9.     PA Lieberman was not an employee of Good Shepherd. (*Id.*; *see also* ECF Doc No. 51, ¶ 2).

10.    PA Lieberman was not an independent contractor of Good Shepherd.

11.    Dr. Hoffman was employed by Medical Imaging of Lehigh Valley at the time of the thoracentesis and worked at Lehigh Valley Hospital. (Ex. E, at 23:4-14).

12.    Medical Imaging of Lehigh Valley is a private practice group employed by Lehigh Valley Hospital. (*Id.*).

13.    Dr. Hoffman was not an employee of Good Shepherd. [ECF Doc No. 51, ¶ 3].

14.    Dr. Hoffman was not an independent contractor of Good Shepherd.

15.    Maureen Unser, RN was the interventional radiology nurse during the thoracentesis; she is employed by Lehigh Valley Hospital. (*See* Deposition of Maureen Unser, RN attached as **Exhibit F**, at 14:12 – 16:2; 53:21 – 54:1).

16.    LVH has a written procedure for the thoracentesis that was performed in this case. (*Id.*, at 22:18 – 44:7 and Ex. 1; *see also* Lehigh Valley Hospital Department of Ultrasound Protocols attached as **Exhibit G**).

17.    Plaintiffs' interventional radiology expert, Bradley Pollard, M.D., confirms that Mrs. Raymond "was transported from [Good Shepherd] to interventional radiology at Lehigh Valley Hospital" on March 8, 2018; that she had the thoracentesis performed by PA Lieberman; and that she was "transferred back to her room at Good Shepherd" after the procedure. (*See* Report of Bradley Pollard, J.D., M.D. attached as **Exhibit H**, at p. 2).

18.     Dr. Pollard concludes that Mrs. Raymond sustained an iatrogenic injury during the thoracentesis and that PA Lieberman violated the standard of care in performing that procedure. (*Id.* at pp. 3-4).

19.     Dr. Pollard did not criticize the care of Good Shepherd. (*Id.*)

20.     No expert states that the care provided by Good Shepherd was below the standard.

21.     Although the experts dispute whether there was an injury and whether PA Lieberman breached the standard of care, it is undisputed that the treatment at issue was performed by PA Lieberman at LVH-M.

22.     Good Shepherd is a separate and distinct entity from LVH-M.

23.     Good Shepherd is a long-term acute-care facility whereas LVH-M is a hospital.

24.     Good Shepherd and LVH-M have separate state licenses.

25.     Through Good Shepherd and LVH-M are in the same building, Good Shepherd is on the third and fourth floors whereas the Interventional Radiology department of LVH-M is on the second floor. (*See* Deposition of Sandra Kenter, RN attached as **Exhibit I**, at 17:23 – 18:24; 24:8-13).

26.     LVH-M and Good Shepherd have separate electronic medical record systems.

27.     LVH uses Epic, which is its electronic medical record program (Ex. A, at 46:8-18).

28.     If a patient was an inpatient at LVH-M, then PA Lieberman could access the patient's recent medical records in Epic. (*Id.*, at 55:3-18).

*29.*     She would not have access to a patient's records or chart if they came from an outside facility or facility that did not use Epic, such as Good Shepherd. (*Id.*).

30.     PA Lieberman did not have access to Mrs. Raymond's chart or records from Good Shepherd (*Id.*, at 104:8 – 105:6).

31.     There is no evidence that Mrs. Raymond, anyone from her family, or any reasonable person would have believed that the providers treating her at LVH-M were agents or employees of Good Shepherd.

32.     Plaintiff testified that there were separate entrances for Good Shepherd and the ICU at LVH-M. (*See* Deposition of John T. Raymond attached as **Exhibit J**, at 117:16 – 118:6).

33.     Plaintiff did not have any trouble differentiating the care at Good Shepherd from the care at LVH-M in the ICU. (*Id.*, at 114:4 – 115:18).

34.     He did not witness the thoracentesis on March 8, 2018. (*Id.* at 60:13-16).

35.     There is no evidence that Good Shepherd was negligent.

36.     There is no evidence that the care provided by Good Shepherd was below the standard.

37.     There is no evidence that PA Lieberman was an agent or employee of Good Shepherd.

38.     Summary judgment should be entered in favor of Good Shepherd and against all other parties.

Respectfully submitted,

GERMAN, GALLAGHER & MURTAGH

Dated: October 18, 2021                    By:   /s/ *John P. Shusted*
                                                  JOHN P. SHUSTED, ESQUIRE
                                                  JACQUELINE E. CAMPBELL, ESQUIRE
                                                  PA.I.D. 44675 / 306647
                                                  200 S. Broad Street, Suite 500
                                                  Philadelphia, PA 19103
                                                  P: 215-875-4037 / 215-875-4015
                                                  F: 215-732-4182
                                                  E: shustedj@ggmfirm.com /
                                                     cambellj@ggmfirm.com
                                                  Attorneys for Defendant, The Allentown
                                                  Specialty Hospital d/b/a Good Shepherd
                                                  Specialty Hospital

8

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ESTATE OF DIANE HELEN RAYMOND by the
Executor JOHN T. RAYMOND and JOHN T.
RAYMOND, individually,

              v.

AMANDA R. LIEBERMAN, PA-C; ERRIN J.
HOFFMAN, M.D.; THE ALLENTOWN
SPECIALTY HOSPITAL d/b/a GOOD
SHEPHERD SPECIALTY HOSPITAL; LEHIGH
VALLEY HOSPITAL, INC.; *et al*.

NO. 5:20-CV-00959-EGS

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF
DEFENDANT, THE ALLENTOWN SPECIALTY HOSPITAL d/b/a
GOOOD SHEPHERD SPECIALTY HOSPITAL**

GERMAN, GALLAGHER & MURTAGH

Dated: October 18, 2021

By: /s/ *John P. Shusted*
    JOHN P. SHUSTED, ESQUIRE
    JACQUELINE E. CAMPBELL, ESQUIRE
    PA.I.D. 44675 / 306647
    200 S. Broad Street, Suite 500
    Philadelphia, PA 19103
    P: 215-875-4037 / 215-875-4015
    F: 215-732-4182
    E: shustedj@ggmfirm.com
      cambellj@ggmfirm.com
    Attorneys for Defendant, The Allentown
    Specialty Hospital d/b/a Good Shepherd
    Specialty Hospital

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.   QUESTION PRESENTED ......................................................................................... 2

III.  RELEVANT PROCEDURAL HISTORY AND FACTS .......................................... 2

IV.  LEGAL ARGUMENT ............................................................................................... 3

    A.  Legal Standard ................................................................................................. 3

    B.  Good Shepherd did not breach any duty of care. .............................................. 4

    C.  PA Lieberman was neither an employee nor contractor of Good Shepherd. ....... 4

    D.  No evidence that PA Lieberman was an ostensible agent of Good Shepherd. .... 4

    E.  Plaintiffs' NIED claim fails as a matter of law. ................................................ 7

V.   RELIEF REQUESTED .............................................................................................. 8

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 3

*Boyd v. Albert Einstein Med. Ctr.*, 547 A.2d 1229 (Pa. Super. 1988) ........................................... 6

*Capan v. Divine Providence Hospital*, 430 A.2d 647 (Pa. Super. 1980)......................................... 5

*Celotex Corp. v.. Catrett*, 477 U.S. 317 (1986) ............................................................................. 3

*Corrigan v. Methodist Hosp.*, 869 F.Supp. 1208 (E.D. Pa.1994) .................................................. 6

*Goldberg v. Isdaner*, 780 A.2d 654 (Pa. Super. 2001) .................................................................. 5

*Graham v. Barolat*, CA 03-2029, 2004 WL 2668579 (E.D. Pa. Nov. 17, 2004) .......................... 6

*Halliday v. Beltz*, 514 A.2d 906 (Pa. Super. 1986)....................................................................... 7

*J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,* 909 F.2d 1524 (3d Cir.1990) ....................................... 3

*Kaucher v. County of Bucks*, 455 F.3d 418 (3d Cir. 2006) ........................................................... 3

*McClellan v. HMO*, 604 A.2d 1053 (Pa. Super. 1992)................................................................. 5

*Parker v. Freilich*, 803 A.2d 738 (Pa. Super. 2002)...................................................................... 6

*Runner v. C.R. Bard*, 108 F. Supp.3d 261 (E.D. Pa. 2015) ......................................................... 7

*Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490 (E.D. Pa. 2010) ...................... 3

*Trap Rock Indus., Inc. v. Local 825,* 982 F.2d 884 (3d Cir.1992).................................................. 3

*Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202 (Pa. Super. 2012) ............................................ 7

*Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458 (3d Cir. 1989) ......................................... 3

*Yacoub v. Lehigh Valley Med. Assocs., P.C.*, 805 A.2d 579 (Pa. Super. 2002) ............................ 5

**Statutes**

40 Pa. Stat. § 1303.516 ............................................................................................................... 5

**Other Authorities**

Restatement (Second) of Agency § 267......................................................................................... 5

Restatement (Second) of Torts § 429........................................................................................... 5

**Rules**

Fed. R. Civ. P. 56........................................................................................................................ 3

## I.       INTRODUCTION

Presently before the Court is the Motion for Summary Judgment of Defendant, The Allentown Specialty Hospital d/b/a Good Shepherd Specialty Hospital (hereinafter, "Good Shepherd").

This medical negligence case arises from a thoracentesis performed on Plaintiff, John T. Raymond's late wife on March 8, 2018. It is undisputed that Mrs. Raymond had the procedure *at Lehigh Valley Hospital-Muhlenberg* and that it was performed by Amanda Lieberman, PA-C ("PA Lieberman"). It is undisputed that Good Shepherd is a separate and distinct entity from Lehigh Valley Hospital-Muhlenberg. None of Plaintiffs' experts state that the care provided by Good Shepherd was below the standard. Accordingly, there is no direct evidence that Good Shepherd was negligent or breached any duty.

It is undisputed that PA Lieberman was employed by Medical Imaging of Lehigh Valley at the time of the procedure. It is undisputed that PA Lieberman was not an independent contractor of Good Shepherd at the time of the procedure. Accordingly, there is no evidence to support a theory of negligence against Good Shepherd based on actual agency or vicarious liability.

Similarly, there is no evidence to support a theory that PA Lieberman was an ostensible agent of Good Shepherd. There is no evidence that Mrs. Raymond, anyone from her family, or any reasonable person would have believed that the providers treating her at Lehigh Valley Hospital-Muhlenberg were agents or employees of Good Shepherd.

Accordingly, and for the reasons set forth herein, summary judgment should be entered in favor of Good Shepherd.

## II.     QUESTION PRESENTED

Should summary judgment be entered in favor of Good Shepherd, because there is no genuine dispute of any material fact and Good Shepherd is entitled to judgment as a matter of law?

**Suggested Answer:   Yes.**

## III.     RELEVANT PROCEDURAL HISTORY AND FACTS

On February 24, 2020, Plaintiff commenced this civil action by filing a Complaint against Defendants, PA Lieberman; Errin J. Hoffman, M.D. ("Dr. Hoffman"); Good Shepherd; Lehigh Valley Hospital, Inc. ("LVH"), and unspecified fictitious persons and entities. [ECF Doc. 1]. An Amended Complaint was filed on May 15, 2020, against the same defendants. [ECF Doc. 25]. Good Shepherd filed an Answer on June 5, 2020, and an Amended Answer on August 10, 2020. [ECF Doc. 37; ECF Doc. 48]. Fact discovery was to be completed by April 30, 2021, and Plaintiffs' expert reports were due June 14, 2021. [ECF Doc. 68]. Dispositive motions are due by October 29, 2021; therefore, this motion is timely filed. [ECF Doc. 78].

In the Amended Complaint, Plaintiffs allege Diane Raymond died following complications from a right thoracentesis performed by PA Lieberman on March 8, 2018. [ECF Doc No. 25, ¶¶ 18-30]. Plaintiffs did not allege that any specific acts or omissions of Good Shepherd caused Mrs. Raymond's death. Rather, Plaintiffs' theories of negligence against Good Shepherd are based on vicarious liability and ostensible agency under 40 Pa.C.S. § 1303.516. (*Id.*, ¶¶ 54-62 (Count Three, "Negligence/Ostensible Agency"); 102-112 (Count Nine, "Negligent Infliction of Emotional Distress/Ostensible Agency"); 138-146 (Count Thirteen "Survival/Vicarious Liability"); 170-178 (Count Seventeen, "Wrongful Death/Vicarious Liability")).

2

For brevity, Good Shepherd incorporates by reference its Statement of Undisputed Material Facts as if fully set forth at length herein.

## IV.    LEGAL ARGUMENT

### A.    Legal Standard

Summary judgment is warranted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. A dispute is "genuine if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is 'material' only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)).

When considering a motion for summary judgment, the court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In making this determination, the court must view all facts, and any reasonable inferences therefrom, in the light most favorable to the non-moving party. *Id.* Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990) (citing *Celotex Corp. v.. Catrett,* 477 U.S. 317, 323 (1986)). A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. *See Trap Rock Indus., Inc. v. Local 825,* 982 F.2d 884, 890 (3d Cir.1992). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to defeat a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490,

493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 461 (3d Cir. 1989)).

> **B.** **Good Shepherd did not breach any duty of care.**

Plaintiffs does not allege that any specific acts or omissions of Good Shepherd caused Mrs. Raymond's death. [ECF Doc. 25]. There are no direct negligence claims against Good Shepherd, and there is no evidence that Good Shepherd was negligent or breached any duty. (*Id.*) None of Plaintiffs' experts state that the care provided by Good Shepherd was below the standard. *See*, *e.g.*, Ex. H. Accordingly, Plaintiffs' claims against Good Shepherd are solely based on vicarious liability for the alleged negligence of PA Lieberman.

> **C.** **PA Lieberman was neither an employee nor contractor of Good Shepherd.**

As a matter of law, Good Shepherd cannot be liable for the acts of PA Lieberman as she was neither an employee, agent, nor independent contractor of Good Shepherd. (Ex. A, at 22:25 – 23:20; 29:24 – 30:4; 36:18 – 37:7; *see also* ECF Doc No. 51, ¶ 2). It is undisputed that PA Lieberman was employed by Medical Imaging of Lehigh Valley at the time of the procedure at LVH-M. (*Id.*) Accordingly, there is no evidence to support a theory of negligence against Good Shepherd based on actual agency or employment.

> **D.** **No evidence that PA Lieberman was an ostensible agent of Good Shepherd.**

Similarly, there is no evidence to support a theory that PA Lieberman was an ostensible agent of Good Shepherd.

Pennsylvania courts first applied the theory of ostensible agency embodied in Restatement (Second) of Agency § 267[1] and Restatement (Second) of Torts § 429[2] to hospitals engaging the services of physicians *on an independent contractor basis* in *Capan v. Divine Providence Hospital*, 430 A.2d 647 (Pa. Super. 1980). Thereafter, the following factors were applied to determine ostensible agency: "(1) whether the patient looks to the institution, rather than the individual physician for care and (2) whether the hospital `holds out' the physician as its employee." *Yacoub v. Lehigh Valley Med. Assocs., P.C.*, 805 A.2d 579, 591 (Pa. Super. 2002) (quoting *Goldberg v. Isdaner*, 780 A.2d 654, 660 (Pa. Super. 2001) (citing *McClellan v. HMO*, 604 A.2d 1053, 1057 (Pa. Super. 1992))). "A holding out occurs `when the hospital acts or omits to act in some way which leads the patient to a reasonable belief he is being treated by the hospital or one of its employees.'" *Id.* (quoting *Capan*, 430 A.2d at 649).

Eventually, the Medical Care Availability and Reduction of Error Act (MCARE Act), 40 P.S. §1303.101 *et seq.*, codified the law of ostensible agency as follows:

> "(a) Vicarious liability—A hospital may be held vicariously liable for the acts of another health care provider through principles of ostensible agency <u>*only if*</u> the evidence shows that: (1) a reasonably prudent person in the patient's position would be justified in the belief that the care in question was being rendered by the hospital or its agents; or (2) the care in question was advertised or otherwise represented to the patient as care being rendered by the hospital or its agents."

40 Pa. Stat. § 1303.516 (emphasis added).

---

[1] Restatement (Second) of Agency § 267 defines ostensible agency as "[o]ne who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such."

[2] Restatement (Second) of Torts § 429 provides that one who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

Notably, in the cases addressing ostensible agency in the healthcare setting, the provider at issue *was an independent contractor* of the medical facility. *See Boyd v. Albert Einstein Med. Ctr.*, 547 A.2d 1229 (Pa. Super. 1988) (finding that an independent contractor physician could be an ostensible agency of an HMO); *Parker v. Freilich*, 803 A.2d 738, 746–50 (Pa. Super. 2002), *app. denied,* 820 A.2d 162 (Pa. 2003) (finding that an independent contractor nurse could be the ostensible agent of a physician who performs an in-office procedure). The classic example is where a patient enters a hospital emergency room and accepts care from the doctor that is assigned by the hospital. In those situations, the patient is looking to the hospital for care and the hospital can be seen as holding out the doctor as its agent. *See Corrigan v. Methodist Hosp.*, 869 F.Supp. 1208, 1213 (E.D. Pa.1994); *see also Graham v. Barolat*, CA 03-2029, 2004 WL 2668579, at *6 (E.D. Pa. Nov. 17, 2004) (granting summary judgment on the ostensible agency claim because plaintiff presented no evidence to indicate she looked to the hospital for care and she first saw the physician at his private office).

Here, there is no evidence to support a claim that PA Lieberman was an ostensible agent of Good Shepherd. First, there is no evidence that a reasonably prudent person would be justified in believing that the thoracentesis was performed by Good Shepherd or its agents. It is undisputed that Mrs. Raymond was transferred from Good Shepherd to the Interventional Radiology department at LVH-M for the procedure. (Ex. A, 101:13-21; 102:12-103:3). It is undisputed that PA Lieberman was neither an employee nor independent contractor of Good Shepherd. (Ex. A, at 22:25 – 23:20; 29:24 – 30:4; 36:18 – 37:7; *see also* ECF Doc No. 51, ¶ 2). Rather, she was an employee of Medical Imaging of Lehigh Valley, a private practice group employed by LVH-M. (*Id.*; *see also* Ex. E, 23:4-14).

It is undisputed that the thoracentesis was performed at LVH-M and that LVH-M had a written procedure for same. (*See* Ex. A, at 101:13-21; 102:12-103:3; *see also* Ex. F, at 22:18 – 44:7; Ex. G). It is undisputed that Good Shepherd is a separate and distinct entity from LVH-M. The facilities have separate electronic medical records, separate licenses, separate nursing staff, and separate policies and procedures. (*See* Ex. A – Ex. J). There is no evidence that Mrs. Raymond or anyone from her family believed, or were led to believe, that PA Lieberman was an agent or employee of Good Shepherd.

Second, there is no evidence that the care in question was advertised or otherwise represented as care being rendered by Good Shepherd or its agents. To the contrary, when obtaining consent for the procedure, PA Minchew identified herself to Plaintiff as a "physician assistant at Lehigh Valley Hospital". (*See* Ex. B, at 48:2 – 53:23; Ex. C). There is no genuine issue of material fact in dispute on this issue. Accordingly, there is no evidence that could support the ostensible agency claim against Good Shepherd.

### E.    Plaintiffs' NIED claim fails as a matter of law.

Pennsylvania law limits negligent infliction of emotional distress ("NIED") claims to four scenarios: (1) situations where the defendant owed a contractual or fiduciary duty to the plaintiff; (2) the plaintiff was subjected to physical impact; (3) the plaintiff was in a zone of danger and reasonably experienced a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative. *Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 217 (Pa. Super. 2012); *see also Runner v. C.R. Bard*, 108 F. Supp.3d 261, 272 (E.D. Pa. 2015). In the medical malpractice setting, a plaintiff must have *actually observed the negligent act* or conduct giving rise to such injury, not just its consequences. *See Halliday v. Beltz*, 514 A.2d 906

(Pa. Super. 1986) (affirming dismissal of NIED claim in medical malpractice case because husband and daughter did not observe negligent acts while they were performed).

Although Plaintiffs assert a NIED claim against Good Shepherd, this claim also fails because there is no negligence attributed to Good Shepherd. (*See* Ex. H). Moreover, Plaintiff did not witness the alleged negligent acts of PA Lieberman while they were performed. (Ex. J, at 60:13-16). Accordingly, Plaintiffs cannot establish a NEID claim against Good Shepherd.

## V.     RELIEF REQUESTED

For the foregoing reasons, Good Shepherd respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment in its favor and against all other parties. There is no evidence that could establish a claim against Good Shepherd. No expert is critical of the care provided by Good Shepherd. The care at issue was performed by PA Lieberman at LVH-M, not Good Shepherd. PA Lieberman is employed by Medical Imaging of Lehigh Valley and works at LVH-M, not Good Shepherd. There is no evidence that a reasonably prudent person would be justified in believing that the thoracentesis was performed by Good Shepherd or its agents. Good Shepherd is a separate and distinct entity from LVH-M. The facilities have separate electronic medical records, separate licenses, separate nursing staff, and separate policies and procedures. Neither Mrs. Raymond nor anyone from her family believed, or were led to believe, that PA Lieberman was an agent or employee of Good Shepherd. There is no evidence that the thoracentesis was advertised or otherwise represented as care being rendered by Good Shepherd or its agents. To the contrary, when obtaining consent for the procedure, PA Minchew identified herself to Plaintiff as a "physician assistant at Lehigh Valley Hospital". Summary judgment is warranted as there is no genuine issue of material fact in dispute and Good Shepherd is entitled to judgment as a matter of law.

Respectfully submitted,

GERMAN, GALLAGHER & MURTAGH

Dated: October 18, 2021        By:  /s/ *John P. Shusted*
                                    JOHN P. SHUSTED, ESQUIRE
                                    JACQUELINE E. CAMPBELL, ESQUIRE
                                    PA.I.D. 44675 / 306647
                                    200 S. Broad Street, Suite 500
                                    Philadelphia, PA 19103
                                    P: 215-875-4037 / 215-875-4015
                                    F: 215-732-4182
                                    E: shustedj@ggmfirm.com
                                       cambellj@ggmfirm.com
                                    Attorneys for Defendant, The Allentown
                                    Specialty Hospital d/b/a Good Shepherd
                                    Specialty Hospital

9

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

ESTATE OF DIANE HELEN RAYMOND by the
Executor JOHN T. RAYMOND and JOHN T.
RAYMOND, individually,

v.

AMANDA R. LIEBERMAN, PA-C; ERRIN J.
HOFFMAN, M.D.; THE ALLENTOWN
SPECIALTY HOSPITAL d/b/a GOOD
SHEPHERD SPECIALTY HOSPITAL; LEHIGH
VALLEY HOSPITAL, INC.; *et al*.

NO. 5:20-CV-00959-EGS

---

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing *Motion for*

*Summary Judgment was* served upon all parties via E.C.F. on the date set forth below.

GERMAN, GALLAGHER & MURTAGH

Dated: October 18, 2021                By:  /s/ *John P. Shusted*

JOHN P. SHUSTED, ESQUIRE
JACQUELINE E. CAMPBELL, ESQUIRE
PA.I.D. 44675 / 306647
200 S. Broad Street, Suite 500
Philadelphia, PA 19103
P: 215-875-4037 / 215-875-4015
F: 215-732-4182
E: shustedj@ggmfirm.com
    cambellj@ggmfirm.com
Attorneys for Defendant, The Allentown
Specialty Hospital d/b/a Good Shepherd
Specialty Hospital

*EXHIBIT "A"*

1  because you don't work there anymore?
2  A.      Correct.
3  Q.      And so tell me what you did there at
4  DRA Imaging.
5  A.      The list of my duties are listed on
6  my CV, but our primary job was to perform
7  procedures in the radiology department.
8  Q.      At a hospital?
9  A.      Hospital and office-based procedures.
10  Q.      So does this CV accurately summarize
11  what you did?
12  A.      So I'll look at it again.  Those are
13  our most common responsibilities.
14  Q.      You had additional tasks that you did?
15  A.      Yes.  There were some other -- other
16  responsibilities.
17  Q.      Like generally, tell me what those
18  other responsibilities would have been.
19  A.      One example would be placement of PICC
20  lines.  Another example would be performance of
21  hip arthrograms.
22  Q.      And why did you leave that job?
23  A.      Because I was moving back to
24  Pennsylvania.
25  Q.      And then it appears you became a

1  physician assistant at Medical Imaging of Lehigh
2  Valley around March of 2012, correct?
3  A.      Correct.
4  Q.      Now, there was a gap for about a year
5  and a half between the time you left New York
6  and you got hired at Medical Imaging.  What was
7  the reason for that gap?
8  A.      Because I had a baby and stayed home
9  with her for a year.
10  Q.      So are you still employed by Medical
11  Imaging of the Lehigh Valley?
12  A.      Yes.
13  Q.      And you've been so since roughly March
14  of 2012 to the present, correct?
15  A.      Correct.
16  Q.      Without interruption?
17  A.      Correct.
18  Q.      Is Medical Imaging of the Lehigh Valley
19  your actual employer?
20  A.      Correct.
21  Q.      Are you a W-2 employee or a 1099
22  employee?
23  A.      I don't know the answer to that.
24  Q.      You get a paycheck on a regular basis?
25  A.      Yes.

1  Q.      And it says Medical Imaging of Lehigh
2  Valley on it?  I didn't hear that.
3  A.      Yes.
4  Q.      Are you employed by Lehigh Valley
5  Health Network at all?
6  A.      No.
7  Q.      Where is Medical Imaging of the Lehigh
8  Valley located?
9  MS. SHANNON:  Object to the form, but
10  you can answer.
11  THE WITNESS:  The business office is
12  located on Cedar Crest Boulevard and the
13  interventional radiology office is located at
14  that location.
15  BY MR. WILHELM:
16  Q.      Okay.  Is there a number for Cedar
17  Crest Boulevard?
18  A.      I don't -- I don't know the address
19  offhand.  I don't work out of that office.
20  Q.      Okay.  Where do you work out of?
21  A.      The hospital and at the 1230 building
22  at Lehigh Valley Imaging is an outpatient
23  diagnostic office under the umbrella of Medical
24  Imaging.
25  Q.      When you say 1230, you mean 1230 Cedar

1  Crest Boulevard?
2  A.      Yes.  The 1230 building on the campus
3  of Lehigh Valley Hospital.
4  Q.      So how many offices does Medical
5  Imaging of Lehigh Valley have, to your
6  knowledge?
7  A.      The Medical Imaging has one office.
8  There's one office.
9  Q.      Okay.  But there's also a business
10  office?
11  A.      I don't work out of the Medical Imaging
12  office.  The interventional radiologists and
13  nurse practitioners see outpatients in that
14  office.  I don't see patients there.  I don't go
15  there.  I couldn't tell you the suite number of
16  that office.  And the business office is located
17  in that same building, but I also don't work out
18  of there or report there.  The other site --
19  okay.
20  Q.      I'm sorry.  Go ahead.
21  A.      The other site I mentioned at the 1230
22  building on Lehigh Valley Hospital's campus, we
23  call that the -- that's -- we call it the LVI,
24  the Lehigh Valley Imaging office.  That's where
25  outpatient ultrasounds and x-rays are performed,

Page 26

1  and we perform arthrograms in that office.
2  Q.    So when you say you report, where do
3  you report to work?  At the hospital?
4  A.    The physician assistants have an office
5  at the hospital, yes.
6  Q.    Who owns Medical Imaging of the Lehigh
7  Valley?
8  A.    I don't know the answer to that.
9  Q.    Who is the CEO of Medical Imaging of
10 the Lehigh Valley?
11 A.    I don't know if that's Greg -- I'm not
12 sure of everyone's title, honestly.  I don't
13 want to answer incorrectly.  I'm not sure.
14 Q.    Okay.  That's fine.
15       Do you have any ownership in Medical
16 Imaging of the Lehigh Valley?
17 A.    No.
18 Q.    So you're having a little bit of
19 difficulty trying to explain to me exactly where
20 Medical Imaging of the Lehigh Valley is located,
21 and I'm having a little difficulty understanding
22 you.  Okay?  And it's not a criticism of you.  I
23 guess that's the way it's set up.
24       But if I were to say I wanted to go to
25 Medical Imaging of the Lehigh Valley on Cedar

Page 27

1  Crest Boulevard, where might I go?
2  A.    If you wanted to go to Medical Imaging
3  offices, I don't remember the building number.
4        MS. SHANNON:  I can't.  I can't tell
5  you what it is.
6  BY MR. WILHELM:
7  Q.    Yeah, she can't answer questions for
8  you.  If you don't know --
9        MS. SHANNON:  I would love to because
10 we could get through this part, but I can't.
11       THE WITNESS:  I was just there the
12 first time the other day.  I don't -- I don't
13 know the building number.  It's located
14 across -- it's across from the hospital.  It's a
15 suite in the building.
16       Again, the outpatient Medical Imaging
17 of the Lehigh Valley office where interventional
18 radiology patients are seen by the
19 interventional radiologists, and nurse
20 practitioners see patients out of that office.
21 And then adjacent to that is the administrative
22 offices for Medical Imaging of the Lehigh
23 Valley.
24       The other office I mentioned is just an
25 outpatient imaging office where we -- on the

Page 28

1  campus of the hospital that we perform
2  procedures.
3  BY MR. WILHELM:
4  Q.    Okay.  So if I came to Cedar Crest
5  Boulevard and I-78 and I was looking for Medical
6  Imaging, are there signs there that would tell
7  me -- that say Medical Imaging of the Lehigh
8  Valley?
9  A.    I don't believe there's a sign.
10 Q.    How would I --
11 A.    I don't recall the building number.  I
12 could walk you there, but I don't recall the
13 building number.
14 Q.    That's fair.
15       So how would I as a member of the
16 public distinguish between Medical Imaging of
17 the Lehigh Valley and Lehigh Valley Health
18 Network if they're located at the same place?
19       MS. WEED:  Object to the form.
20       MS. SHANNON:  Objection to the form.  I
21 think -- well, objection to the form.
22 BY MR. WILHELM:
23 Q.    Go ahead.  Answer the question.
24       MS. SHANNON:  If you can understand,
25 you can answer.

Page 29

1        THE WITNESS:  Can you repeat the
2  question?
3        MS. WEED:  I objected to the form.  I'm
4  sorry.  I don't know if you could hear me with
5  the muting.
6  BY MR. WILHELM:
7  Q.    So how is somebody like myself if they
8  came to Cedar Crest and I-78 and were looking
9  for Medical Imaging of the Lehigh Valley, how
10 are they going to find that office?
11 A.    Because they would have a building and
12 suite number to go to.  Again, the Medical
13 Imaging of the Lehigh Valley, which implies the
14 interventional radiology office, is located in
15 the corporate center across the street from the
16 hospital on Cedar Crest Boulevard.
17 Q.    All right.  But you are acknowledging
18 that Medical Imaging does work at Lehigh Valley
19 Hospital?
20       MS. WEED:  Object to the form.
21       MS. SHANNON:  Objection to the form.
22       MS. WEED:  Join.
23 BY MR. WILHELM:
24 Q.    Right?  You said you're an employee of
25 Medical Imaging of the Lehigh Valley, correct?

8 (Pages 26 - 29)

1    A.    Correct.
2    Q.    You do procedures at Lehigh Valley
3    Hospital, correct?
4    A.    Correct.
5    Q.    Do you have any knowledge as to how the
6    business relationship between Medical Imaging of
7    the Lehigh Valley and Lehigh Valley Health
8    Network is arranged?
9    A.    I have no knowledge of that.
10    Q.    What is Cal Imaging, C-A-L, Cal Imaging
11    of the Lehigh Valley?
12    A.    I've never heard of that.
13    Q.    Did you work at Cal Imaging of the
14    Lehigh Valley between May of 2018 and February
15    of 2019?
16        MS. SHANNON:  Are you saying Cal, C as
17    in cat?
18        MR. WILHELM:  C-A-L.
19        THE WITNESS:  No.
20    BY MR. WILHELM:
21    Q.    Okay.  You have individual -- you have
22    individual professional liability insurance,
23    correct?
24    A.    I have malpractice insurance, if that's
25    what you mean.

1    Q.    Sure.  Let me ask that better.  I'm
2    sorry.
3        Do you have your own individual
4    professional policy that you obtained that you
5    pay for?
6    A.    No, I do not.
7    Q.    You have coverage through Medical
8    Imaging of the Lehigh Valley?
9    A.    Correct.
10    Q.    Do you have any insurance coverage from
11    anywhere else other than Medical Imaging of the
12    Lehigh Valley, to your knowledge?
13        MS. SHANNON:  For professional
14    liability?
15        MR. WILHELM:  Yes.
16        THE WITNESS:  No, I do not.
17    BY MR. WILHELM:
18    Q.    Okay.  So what is your job title at
19    Medical Imaging?
20    A.    Physician assistant.
21    Q.    All right.  And tell me what your job
22    duties are.
23    A.    We have many duties, but our main
24    responsibility is performing procedures in the
25    radiology department.

1    Q.    The radiology department of the
2    hospital?
3    A.    Yes.
4    Q.    So tell me what kind of procedures you
5    perform.
6    A.    Again, there's a list of procedures,
7    but the most common procedures I perform are
8    ultrasound-guided thyroid and lymph node biopsy,
9    ultrasound-guided paracentesis and
10    thoracentesis, fluoroscopically guided joint
11    injection and aspiration, fluoroscopically
12    guided lumbar punctures, myelograms.  Those are
13    the most common procedures.
14    Q.    Okay.  How frequently do you work?  Do
15    you have a set schedule, for instance?
16    A.    I work two -- generally two days a
17    week.
18    Q.    Full days?
19    A.    Yes.
20    Q.    10 hours, 8 hours?
21    A.    Approximately 8 hours.
22    Q.    And how long have you been working two
23    days a week?
24    A.    Since I started work at Medical
25    Imaging.

1    Q.    According to your CV, you are a
2    radiology physician assistant.  Have you ever
3    had any other job titles at Medical Imaging?
4    A.    No.
5    Q.    Do you have a direct supervisor at
6    Medical Imaging?
7    A.    What do you mean by direct supervisor?
8    Q.    Someone that you would report to.
9    You're employed by Medical Imaging.  Is there
10    somebody at Medical Imaging that you have to
11    report to?
12        MS. SHANNON:  Object to the form.
13        THE WITNESS:  I still have to answer?
14        MS. SHANNON:  You can answer.  I think
15    the disconnect is the difference between
16    clinically -- does she report to someone
17    clinically versus does she report to someone in
18    an HR sense.  I think that's the --
19        MR. WILHELM:  Understood.
20    BY MR. WILHELM:
21    Q.    For instance, there's paralegals that
22    work with me that would work under me, report to
23    me.  Is there somebody that you have to report
24    to aside from a doctor you might be working with
25    on a particular patient?

9 (Pages 30 - 33)

Page 34

1    A.    I'm sorry.  You broke up there.  Could
2  you repeat that question?
3    Q.    Sure.  Do you have a supervisor that
4  you report to on any type of regular basis aside
5  from the doctor you're working with on a
6  particular patient?
7    A.    No, I do not.
8    Q.    Okay.  So in other words, I asked you
9  earlier who the CEO of Medical Imaging is, and
10 you said you weren't sure, right?
11       Are there managers of Medical Imaging
12 or is it just doctors?
13   A.    The leadership that I'm aware of, Greg
14 Palmieri and Jim Foley, are, you know, involved
15 in the administration of Medical Imaging.  I do
16 not have to directly report to them for any
17 reason.
18   Q.    Are they physicians?
19   A.    No.
20   Q.    So do you -- when you're working with a
21 particular patient, do you report to a physician
22 at Medical Imaging?
23   A.    I report to my supervising physician,
24 if necessary.
25   Q.    Do you have any patients that would

Page 35

1  just be yours where there is no physician
2  involved?
3       MS. SHANNON:  Object to the form, but
4  you can answer.
5       THE WITNESS:  A physician assistant
6  functions under the direct supervision of a
7  physician.
8  BY MR. WILHELM:
9    Q.    For all your patients?
10   A.    Yes.
11   Q.    At Medical Imaging are there also
12 nurses employed?
13   A.    No.
14   Q.    To your knowledge, is it just
15 physicians and physician's assistants?
16   A.    And nurse practitioners.
17   Q.    And nurse practitioners.  Okay.  Do you
18 have any supervisory role over anybody at
19 Medical Imaging on a regular basis?
20   A.    No.
21   Q.    So how is it through Medical Imaging
22 that you typically are assigned a task?
23   A.    What do you mean by task?
24   Q.    A job.  A patient comes in -- a patient
25 goes to Medical Imaging for whatever reason.

Page 36

1  How do you get involved in that particular
2  patient's care?
3       In other words, are they coming to see
4  you or are they coming to see a doctor and then
5  a doctor assigns you a task, that type of thing?
6    A.    And again, I'm sorry if I caused
7  confusion about Medical Imaging and the
8  hospital.  I don't see patients at all at the
9  Medical Imaging of the Lehigh Valley office.
10 Those patients are interventional radiology
11 outpatients, and those are only seen by the
12 interventional radiologists and the nurse
13 practitioners.
14       Patients that I am seeing are
15 physically at the hospital or at the 1230
16 building office of the -- the outpatient
17 diagnostic office.
18   Q.    Okay.  So again -- and I'm sorry.  I
19 apologize if I'm not being clear.  How is it
20 that you end up seeing patient A?
21   A.    So there's a team of physician
22 assistants, and our lead PA will make
23 assignments on what area of radiology -- of what
24 radiology area we're assigned to that day.  And
25 we have a list of outpatients on the schedule,

Page 37

1  and then we will get inpatient add-ons
2  throughout the day, and we help each other to
3  cover those procedures.
4       And I forgot to mention, I also perform
5  procedures at Lehigh Valley Hospital-Muhlenberg.
6  We work at both sites.  Both have -- in the
7  radiology department.
8    Q.    Okay.  Thank you.
9       Okay.  So there's a lead physician
10 assistant, you just said, who's going to
11 basically assign tasks?
12   A.    He'll assign a physician assistant to
13 fluoro-guided procedures, assign someone to
14 ultrasound-guided, but, you know, we work as a
15 team to help each other, you know, take care of
16 the patients.
17   Q.    Right.  Okay.  So it would be accurate
18 to say you work with numerous -- more than one
19 patient at a time?  In other words, if you come
20 in on a Monday to work, there's -- you're likely
21 to work -- be dealing with more than one
22 patient, is that correct?
23   A.    You said at a time.  Do you mean in a
24 given day?
25   Q.    Yes, in a given day.

10 (Pages 34 - 37)

---

Page 46

1  Q.   Like an x-ray, for instance?
2  A.   Yes.
3  Q.   Do those orders have to be under the
4  name of a -- for instance, if you're going to
5  order a chest x-ray, does it have to be under
6  the name of a doctor?
7  A.   The order is under my name.  Currently
8  we operate under -- Epic is the electronic
9  medical record.  When I'm ordering medications
10 or if I ordered an imaging study within the
11 electronic medical record, any physician
12 assistant entering an order in there would have
13 to assign a cosigner to the order which would be
14 my -- one of my supervising physicians.
15 Q.   The Epic system, E-P-I-C?
16 A.   E-P-I-C is the name of the hospital --
17 the hospital network's electronic medical
18 record.
19 Q.   So what you just described is the way
20 you do it under the Epic system?
21 A.   Correct.  Could I finish -- could I
22 further --
23 Q.   Yes.
24 A.   If I was writing an order on a
25 prescription pad or writing a prescription for a

Page 47

1  patient on a prescription pad, which rarely
2  occurs because of the adoption of the electronic
3  medical record, I do not need that cosigned by a
4  physician.
5  Q.   Okay.  Thank you.
6       But I'm a patient of yours, and you
7  decide I need a chest x-ray.  You put it in the
8  Epic system.  You're saying there would be a
9  doctor who would have to cosign that?
10 A.   Yes.
11 Q.   So briefly tell me about the Epic
12 system.  Is that just a Lehigh Valley Network
13 system or is that a nationwide system?  What do
14 you know about it?
15      MS. SHANNON:  Object to the form.  You
16 can answer.
17      THE WITNESS:  I could just tell you
18 that Lehigh Valley Hospital Network has
19 adopted -- several years ago adopted Epic, but
20 there's other networks that also operate under
21 Epic.  I know St. Luke's does as well, and there
22 can be communication between different networks
23 through Epic.
24 BY MR. WILHELM:
25 Q.   Okay.  So on charting -- or maybe

Page 48

1  that's not a good word.  Do you put all of your
2  orders and your notes -- in the system, do you
3  type them in or do you write them out on a piece
4  of paper?
5  A.   They're typed.
6  Q.   Do you personally do it?
7  A.   Usually I do.  There are occasions when
8  a verbal order is given to a nurse, and she'll
9  enter the order under -- under me then to be
10 cosigned by the supervising physician.
11 Q.   Okay.  But no paper -- no paper notes?
12      MS. SHANNON:  Object to the form.  Hold
13 on.  Object to the form.
14 BY MR. WILHELM:
15 Q.   I don't mean notes.  I mean paper
16 records.
17      MS. SHANNON:  Pertaining to her
18 procedures?
19      MR. WILHELM:  Yes.
20      MS. SHANNON:  Okay.
21      THE WITNESS:  Not since Epic.
22 BY MR. WILHELM:
23 Q.   Okay.  That's fine.
24 A.   Except for --
25 Q.   Go ahead.

Page 49

1  A.   Okay.  You asked about notes.  No, no
2  notes.
3  Q.   Is there an exception?
4  A.   No.  I was going to say that if a
5  patient brings -- if an outpatient would bring
6  some type of outside document, there are --
7  forms can be scanned into Epic, but when it's
8  relating to me and my documentation, that is
9  only in Epic.  I just wanted to clarify that.
10 Q.   Thank you.
11      So tell me now, let's just say in the
12 last few years, what kind of procedures you have
13 experience in.  You know, for instance -- just
14 for instance, you use the words fluoroscopy and
15 thoracentesis and paracentesis, whatever.
16      Just, say, in the last three or four
17 years, tell me generally what your experience is
18 procedure-wise.
19 A.   The same procedures that I listed
20 before, the same list.  Do you need me to repeat
21 the list?
22 Q.   There were about nine of them.  Yes,
23 please repeat the list.
24 A.   You want me to repeat my list?
25 Q.   Please.

Page 54

1    (Discussion held off the record.)
2    THE WITNESS: I just said it's very
3    difficult to answer that given that the
4    department is structured slightly differently at
5    Muhlenberg, you know, versus at Cedar Crest.
6    But in general, you know, I'm focused
7    to review the pertinent aspects of the patient's
8    chart, specifically, again, imaging, if they're
9    on anticoagulation and their pertinent blood
10   work, and that may be all that's necessary to
11   review before the procedure.
12   BY MR. WILHELM:
13   Q.    And you make the decision on what
14   you're going to review yourself?
15   A.    Yes. Yes, in conjunction with the
16   nurse. If the nurse would alert me to -- you
17   know, to some concern or if the triage nurse
18   would speak to the patient's nurse and any
19   concern would be raised -- any concern would be
20   brought up there, you know, I might investigate
21   further.
22   Q.    Okay.
23   A.    But that's a very general answer, and
24   that very much so depends. My scope of practice
25   is to perform a procedure within our guidelines

Page 55

1    as long as there's no contraindication to the
2    procedure.
3    Q.    Okay. Do you have the ability to look
4    at the patient's chart if you -- entire medical
5    chart if you wanted to?
6    MS. SHANNON: Objection to the form.
7    THE WITNESS: That depends -- where is
8    the patient coming -- it depends where the
9    patient is from.
10   BY MR. WILHELM:
11   Q.    Well, if they're at -- if they're in
12   the Epic system, you would have access to that
13   chart, correct?
14   A.    If the patient was an inpatient at
15   Lehigh Valley Health Network, then their recent
16   documentation would be in the Epic record. If a
17   patient was coming from -- an outpatient coming
18   from an outside facility, I wouldn't necessarily
19   have, you know, access to any of their records.
20   Q.    How about interviewing a patient before
21   a procedure, do you do that or are you going on
22   the triage that the nurse did?
23   A.    What do you mean by interview?
24   Q.    Well, speak with the patient.
25   A.    Well, I would speak to the patient when

Page 56

1    they would arrive in the department for consent.
2    Q.    Okay. Other than consent, is there
3    anything else you speak with the patient about?
4    In other words, do you explain the
5    procedure to them or are you relying on somebody
6    else having explained the procedure, that type
7    of thing?
8    MS. SHANNON: Objection to the form.
9    If you don't understand, you can ask him to
10   clarify.
11   THE WITNESS: Could you clarify that?
12   Ask that again.
13   BY MR. WILHELM:
14   Q.    Sure. Do you speak with the patient, I
15   asked you, and you said yes, to get consent,
16   correct?
17   A.    Yes.
18   Q.    Do you speak with the patient about
19   anything else other than consent for the
20   procedure?
21   A.    I answer their questions, I explain the
22   procedure, and I make sure, you know, to answer
23   any -- you know, any questions the patient has,
24   I do my best to answer --
25   Q.    Okay.

Page 57

1    A.    -- you know, before the procedure.
2    Q.    Okay. So after you performed, let's
3    say, a thoracentesis again and the procedure is
4    completed, what do you do from the time the
5    procedure is completed in terms of documenting
6    what you've done?
7    A.    So the question is, what do I document
8    after the thoracentesis?
9    Q.    After the procedure is over, what do
10   you do? You just got done actually performing
11   the procedure. You're taking off your gloves,
12   whatever, you know, and you're leaving, what do
13   you do?
14   MS. SHANNON: Objection to the form.
15   You can answer.
16   THE WITNESS: So I would make sure my
17   patient was feeling okay; I would leave and
18   document my procedure note; I would order their
19   postprocedure chest x-ray; and that would be it.
20   They'd be returned to the floor, you know,
21   returned back to their room if you're talking
22   about an inpatient.
23   BY MR. WILHELM:
24   Q.    Okay.
25   A.    If it was an outpatient, same thing.

15 (Pages 54 - 57)

1 and how you're assigned a procedure.
2      I guess what I'm asking is:  Have you
3 done procedures where Dr. Hoffman is the
4 attending physician who ordered a procedure?
5 A.    No.  Dr. Hoffman wouldn't order -- we
6 don't order the procedures within our
7 department.  I'm not understanding your -- your
8 question or what you're trying to ask me.
9 Q.    Okay.  That's fine.
10      Dr. Hoffman's an interventional
11 radiologist, correct?
12 A.    Uh-huh.
13 Q.    Yes?
14 A.    Yes.  Sorry.
15 Q.    Who's ordering the procedures that
16 you're doing?  You just said Dr. Hoffman
17 wouldn't order a procedure.  Who's ordering the
18 procedure that you're doing?
19 A.    A member of the care team of the
20 patient.
21 Q.    Is Dr. Hoffman a member of the care
22 team of patients that you've worked on?
23 A.    Not these patients, no.
24 Q.    I guess I'm -- forgive me.  I'm just
25 not understanding.

1      If you both work for Medical Imaging
2 and he's a radiologist there and you're
3 a PA there and based -- for instance, in
4 Mrs. Raymond's case, Dr. Hoffman was involved in
5 her care, and he cosigned the thoracentesis
6 report?
7 A.    Uh-huh.
8 Q.    So --
9 A.    Yes.
10 Q.    -- have you had experience with -- so
11 that's a patient, Diane Raymond, that you did a
12 procedure on that Dr. Hoffman then cosigned,
13 okay, the procedure.
14      Can you give me an idea of how many
15 other patients you did a procedure on -- a
16 thoracentesis on where Dr. Hoffman was a
17 cosigner?  Maybe that's a better question.
18 A.    Oh, okay.  I couldn't give a number.  I
19 don't know the answer to that.  There's multiple
20 interventional radiologists that we work with
21 that I would assign -- that would be a cosigner
22 to my procedures or supervising me.
23 Q.    Okay.
24 A.    I don't know how many Dr. Hoffman has
25 been involved with or cosigned for me.

1 Q.    Would this be accurate:  If you got
2 assigned to do a thoracentesis on Jane Doe one
3 day, like, tomorrow and then you did your note,
4 you wouldn't -- you wouldn't know necessarily
5 who the radiologist is that's cosigning?
6 A.    No.  I assign my cosigner.
7 Q.    How do you assign your cosigner?
8 A.    Through Epic, when I place my progress
9 or procedure note or, as I mentioned earlier, an
10 order, I assign a cosigner.
11 Q.    Explain that to me.  How do you get to
12 assign a cosigner?  Do you just get to pick?
13 A.    I pick the physician who's, you know,
14 in direct supervision of me for performing that
15 procedure.  So if Dr. Hoffman is the
16 interventional radiologist present and assigned
17 that we're working with at Lehigh
18 Valley-Muhlenberg, let's say for example, then
19 any procedures myself or another physician
20 assistant working in the department that day, he
21 is the supervising physician for the procedure.
22 Q.    That's my bad.  I guess I didn't
23 understand that.
24 A.    Okay.
25 Q.    So if you go in to work tomorrow,

1 there's going to be an interventional
2 radiologist physician working?
3 A.    Present in the department, yes.
4 Q.    And that's who you would assign your
5 procedure that you do tomorrow to?
6 A.    Correct.
7 Q.    Okay.  Thank you.
8      MR. WILHELM:  This would probably be a
9 good point for 5 or 10 minutes.  I'm going to
10 get into Mrs. Raymond specifically.
11      (Short recess was taken.)
12 BY MR. WILHELM:
13 Q.    Mrs. Lieberman, do you know who Diane
14 Raymond is?
15 A.    Yes.
16 Q.    How?
17 A.    She was a patient I performed a
18 thoracentesis on.
19 Q.    When did you perform that thoracentesis
20 on her?
21 A.    March 8th, 2018.
22 Q.    Do you know who Jack Raymond is?
23 A.    I now know that's the name of her
24 husband.
25 Q.    To your recollection, have you ever met

1  Mr. Raymond?
2  A.    No, I have not.
3  Q.    Do you know if you provided any care
4  to -- or treatment or procedure to Mrs. Raymond
5  prior to March 8 of 2018?
6  A.    I did not.
7  Q.    Can you explain to me how it came about
8  that you were to perform -- oh, strike that.
9        Did you do anything with Mrs. Raymond
10 other than a thoracentesis?
11 A.    No, I did not.
12 Q.    Can you explain to me how that was
13 assigned to you that day?
14 A.    To the best of my recollection,
15 Mrs. Raymond was a patient of the Good Shepherd
16 Specialty Hospital, and an order was placed for
17 her to undergo a right-sided therapeutic
18 thoracentesis.
19       And consent was obtained for that
20 procedure by my co-worker. Carin Minchew is
21 another physician assistant in our department.
22 She obtained witnessed phone consent from the
23 patient's husband.
24       And when the patient became available
25 to come down to the interventional radiology

1  department at Muhlenberg for the procedure,
2  Carin was unavailable to perform the procedure,
3  so I was asked to perform her thoracentesis.
4  Q.    Do you recall who asked you to perform
5  because Carin was not available?
6  A.    I don't -- I don't recall specifically.
7  It would have been one of the nurses or
8  interventional radiology technicians asking if I
9  was available.
10 Q.    Prior to that, being asked to perform
11 or directed, however you want to say it, the
12 procedure, did you know anything at all about
13 Mrs. Raymond?
14 A.    No.
15 Q.    So when you were assigned a task, you
16 knew you were going to do the task, can you tell
17 me what you did before you actually performed
18 the thoracentesis?
19 A.    I reviewed -- excuse me. I reviewed
20 her chest imaging, her recent chest imaging.
21 Q.    Do you know when that chest imaging was
22 from in relation to March 8th, 2018?
23 A.    I'd have to look at the document to
24 confirm the date. Should I do that?
25 Q.    No. I'm just asking you if you recall

1  at the present time.
2  A.    Oh. I don't -- I don't recall the
3  exact -- I think it was just a few days before.
4  Q.    Before you went in to do the procedure,
5  you described right-sided therapeutic pleural
6  effusion. Did you have any details about why
7  you were going to be doing this?
8  A.    At the time, I was aware that the
9  patient had a history of ventilator-dependent
10 respiratory failure, and the therapeutic
11 thoracentesis was being ordered in hopes of
12 improving her breathing and oxygenation and
13 hopeful weaning of her from the ventilator.
14 Q.    That information you obtained from
15 looking at her chart or speaking with people?
16 A.    No. I don't have access to the Good
17 Shepherd Specialty Hospital charting.
18 Q.    Okay.
19 A.    That information would have been
20 obtained when the triage nurse, the nurse I
21 would be working with in the holding area in
22 interventional radiology, would have spoken on
23 the phone with the patient's nurse to confirm
24 the patient was stable for the -- stable for the
25 procedure; if the patient was consentable; if

1  not, who we'd obtain consent from.
2        The only way we would obtain any
3  clinical history on a patient from Good Shepherd
4  would be if the patient's nurse related to
5  either me directly or the triage nurse I was
6  working with that day.
7  Q.    Okay. So I'm going to ask you for a
8  moment to accept my representation that I
9  believe this procedure started around 9:30 a.m.
10 So do you have any independent recollection of
11 that?
12 A.    An independent recollection of the
13 exact time, no.
14 Q.    So please accept my representation for
15 purposes of this question. Do you know what
16 time you started work that day?
17 A.    Approximately 8:00.
18 Q.    And do you know if you did any
19 procedures before Mrs. Raymond's which, again,
20 started around 9:30?
21 A.    I don't specifically remember, but it's
22 likely that I did.
23 Q.    Okay. And if you had, you would have
24 put -- that would be documented somewhere in the
25 Epic system you believe?

27 (Pages 102 - 105)

*EXHIBIT "B"*

1    type of periodic basis?
2    A.      Every two years.
3    Q.      And generally, what do you need to do to
4    renew that?
5    A.      Comply with the continuing education
6    requirements, pay the necessary fees and the mandated
7    training that we have to do, child abuse, opioid.
8    Q.      So basically there's three components,
9    pay the fee, get your CMEs and do whatever mandatory
10   training the Commonwealth requires?
11   A.      Yes.
12   Q.      Is that a fair summary?
13   A.      Yeah.
14   Q.      I don't want to put words in your mouth,
15   if not you tell me?
16   A.      Yeah, I mean, they give us the list.  I
17   do what the list says.  I'm pretty sure those are the
18   main components.
19   Q.      And on those two-year renewals, again,
20   you have done everything you needed to do to
21   continually have that license, correct?
22   A.      Yes.
23   Q.      Every once in a while, we are not just
24   hearing you.
25           Are you a member of any

1    professional affiliations or groups?
2    A.      The Pennsylvania Society of Physician
3    Assistants.
4    Q.      Okay.  And how long have you been part of
5    that?
6    A.      Probably since 2012.
7    Q.      Okay.
8            (Exhibit Number 1 was marked for
9    identification.)
10   BY MR. WILHELM:
11   Q.      Your CV that you provided or your counsel
12   provided me yesterday, I marked as Exhibit 1 and sent
13   back.  Is that an accurate representation currently
14   of your education, training and experience?
15   A.      Yes.
16   Q.      Are there any changes that you need to
17   make to that?
18   A.      No.
19   Q.      At the bottom, there's certifications
20   listed.  Can you just explain to me what those five
21   certifications are?
22   A.      So the NCCPA Board certification is the
23   passing of the board tests that we have to take and
24   maintain, so I have done that and recertified since
25   graduating from PA school.

1            BLS is basic life support.  That is
2    maintained and you have to retake every two years.
3            ACLS is advanced cardiac life
4    support, which is also maintained and recertified
5    every two years.
6            ATLS is advanced trauma life
7    support.
8            And FCCS is a fellow of critical
9    care -- I'm not sure what the S is, to be honest.  It
10   is a critical care course that you have to take.
11   Q.      The ATLS, is that required to be renewed
12   or is that as part of your license?
13   A.      It's not required for my license, no.
14   That was a certification that I obtained from my
15   previous employment, which is not required to be --
16   maintained through this current employment, so I
17   haven't taken the class recently again.
18   Q.      Okay.  So who is your employer right now?
19   A.      MILV.
20   Q.      So according to your CV you -- can you
21   tell me where you -- you have two experiences written
22   here, physician assistant interventional radiology,
23   physician assistant trauma and general surgery.
24           Do you see that?
25   A.      Um-hum.

1    Q.      Were they -- are they for the same
2    employer?  Can you explain that?  Let me ask a better
3    question.
4            You're employed by MILV now.  How
5    long have you been employed by MILV?
6    A.      July 2017.
7    Q.      Let's go to the other one, the physician
8    assistant, Allentown and East Stroudsburg, who was
9    your employer then?
10   A.      Lehigh Valley Physician's Group.
11   Q.      Okay.  And then the list of your job
12   duties under -- or your experience under that at
13   LVPG, is that an accurate summary of what you did?
14   A.      Yes.
15   Q.      So there was some overlap at working at
16   LVPG and MILV?
17   A.      Yeah.  I maintained my privileges at
18   Pocono and did a little bit of per diem work for them
19   after taking the job with MILV.
20   Q.      Okay.  So when you were at LVPG you write
21   trauma and general surgery, and then for MILV it says
22   interventional radiology, correct?  So your focus now
23   is interventional radiology, right?
24   A.      Yes.
25   Q.      So you -- do you receive your paychecks

1    from MILV?
2    A.      Yes.
3    Q.      So give me -- your job title then is
4    physician's assistant, correct?
5    A.      Yes.
6    Q.      Do you have a regular schedule -- work
7    schedule of hours and days?
8    A.      Yes.
9    Q.      And what is that?
10   A.      Monday through Friday, typically
11   approximately 7:30 to around -- somewhere between
12   3:30 and 4:30.
13   Q.      Has that schedule been pretty consistent
14   since you started in July of 2017?
15   A.      Pretty consistent.  There was a little bit
16   later to start, and there's been some need to move
17   the day earlier to accommodate patients.
18   Q.      But it's always been full-time, is that
19   correct?
20   A.      Yes.
21   Q.      Do you have a place that you report
22   physically for your job?
23   A.      Yes.
24   Q.      Where is that?
25   A.      At Lehigh Valley Muhlenberg primarily.

1    Q.      Do you go to other places, too?
2    A.      Initially, I was going to Cedar Crest;
3    but for the past, probably almost three years, it's
4    been exclusively at Muhlenberg.
5    Q.      Okay.  So tell me what your -- this is
6    not a good word, but tell me what your typical day is
7    like.
8    A.      So I get in around 7:30 or so.  Log in to
9    the computer.  Have a discussion with -- look at the
10   schedule of prescheduled patients, and then typically
11   would have a discussion with the nurse assigned to
12   the area for the day about any in-house or Good
13   Shepherd patient add-ons that need to be
14   accommodated.
15          And then we go about tackling the
16   load of work.  If I have another PA working with me
17   that day, which is one to two days a week, we would
18   have a discussion conferring, kind of, how we will go
19   about splitting the responsibilities for the day.
20   Q.      Is it accurate to say that there's always
21   a physician there though when you are working?
22   A.      There's always a physician in-house when
23   we are working.
24   Q.      In the IR department?
25   A.      Yes.

1    Q.      So I've asked a lot of questions of Ms.
2    Lieberman and Dr. Hoffman, so I have a good idea and
3    I will not rehash that stuff.  So I am clear, you go
4    in and there's a list of assignments for physician
5    assistants.  And then if you are the only one
6    working, you are going to do the best you can to take
7    them on.
8           If there's another person, you may
9    discuss -- another physician assistant, you may
10   discuss who is going to do what?
11   A.      Yeah.  And the doctor is always
12   available.  So, say, if his schedule or her schedule
13   is not as busy as mine, then they also can help with
14   the mountain of work.
15   Q.      Now, you said the nurse.  So who is
16   putting the assignments in, like, a nurse -- just a
17   nurse in radiology?
18   A.      So there -- the outpatients are scheduled
19   through our scheduling department.  And then there's
20   a nurse assigned to my area that kind of monitors the
21   work flow.  The orders for the actual procedures are
22   entered by the physicians caring -- physicians,
23   NPPAs, PAs or the provider caring for the patients.
24   Q.      Okay.  So on any given day, would it be
25   accurate to say you don't know, for certain, when you

1    wake up in the morning how many assignments you are
2    going to have or how many patients you will address
3    or how many procedures you will do, is that correct?
4    A.      Yeah, that would be accurate.
5    Q.      Again not a great word, but on a typical
6    day, about how many procedures might you do?
7    A.      On average, I probably have between 13
8    and 15 patient contacts a day.
9    Q.      What is a patient contact?
10   A.      So that would be either a procedure that
11   we do or being involved, either seeing one of the
12   more complicated patients postoperatively or managing
13   patients postprocedure that some of the physicians
14   do.
15   Q.      Now, on your CV you listed some of your,
16   again, typical procedures that you do.  Is that a
17   fair representation of what you do, the procedures
18   that you do?
19   A.      Yes.
20   Q.      Do you do any assisting of physicians of
21   procedures?
22   A.      Not typically.
23   Q.      Okay.  On your CV you also wrote, on the
24   last bullet point, participate in departmental
25   development meetings.  What does that mean?

1    A.      Yes.
2    Q.      Okay.  The Good Shepherd nurse, do you
3  have any recollection of what this nurse looked like?
4    A.      No.
5    Q.      Before the procedure started, did you
6  speak with Dr. Hoffman about Ms. Raymond at all?
7    A.      No, not that I recall.
8    Q.      Do you know if you spoke with Carol
9  Rotman, a nurse practitioner, prior to the procedure?
10    A.      I don't believe so.
11    Q.      Do you recall if you spoke with a
12  Dr. Stroble that morning, prior to the procedure?
13    A.      I don't believe so.
14    Q.      If you had spoken with anybody that
15  morning, any other healthcare professional that
16  morning prior to the procedure, do you believe you
17  would have documented that?
18          MS. SHANNON:  Object to the form,
19  but you can answer.
20    A.      Not if it wasn't pertinent to her care.
21  So if it was simply a conversation asking about the
22  time of the thoracentesis, I would not have
23  documented that.
24    Q.      But you do recall speaking generally with
25  Ms. Lieberman about what, who was going to do the

1  procedure?
2    A.      Just the list of the day.  So we keep one
3  patient list for the day that we work off of.
4    Q.      So typically tell me how that works.  I
5  mean, is it a running list and there's 20, and you
6  guys just go right down the list as you're available?
7  Like, tell me how that works.
8    A.      So we have a list of scheduled
9  outpatients that have specific times to come in.  And
10  then as patients are added on or orders are put in
11  the computer, what we call add-ons, then they get
12  added to the list and we approach them in the most
13  reasonable way possible, depending on timing or
14  necessity of a procedure being done ahead of one
15  another -- another one.
16    Q.      Understood.
17          Were you -- did you ever have any
18  intention or plan to perform Ms. Raymond's
19  thoracentesis that morning?
20    A.      I would have been available to do the
21  procedure.  It's just as likely that I would have
22  done it as Amanda.
23    Q.      Okay.  More specific question, do you
24  have any recollection that you were going to do the
25  procedure and then, for whatever reason, it was

1  switched to Amanda doing it?
2    A.      We didn't specifically divide up any one
3  specific case.  It kind of is a little bit how it
4  comes.
5    Q.      But my question is, do you recall what I
6  just said, any discussion about -- I am going to do
7  this patient, Ms. Raymond, and then that changing?
8    A.      No.
9    Q.      So as far as you knew, you never were --
10  you had never planned to do Ms. Raymond's procedure?
11          MS. SHANNON:  Object to the form.
12  BY MR. WILHELM:
13    Q.      Let me rephrase that question.
14          In Ms. Lieberman's deposition, she
15  testified to the effect that you were not available
16  so she did the procedure.  So do you know, at any
17  point were you planning on doing the procedure?
18    A.      If I had been available I could have done
19  the procedure.
20    Q.      Is there any reason that you are aware of
21  that you would not have done the procedure other than
22  availability?
23    A.      No.
24    Q.      So on your exhibits, if you can go to
25  Exhibit 2.

1          (Exhibit Number 2 was marked for
2  identification.)
3  BY MR. WILHELM:
4    Q.      Do you have that?
5    A.      Yes.
6    Q.      And it's two pages.  Do you see that?
7    A.      Yep.
8    Q.      Have you seen this two-page document
9  before?
10    A.      Yes.
11    Q.      And when did you -- when have you seen
12  this document before?
13    A.      I saw it when I filled it out and in the
14  deposition premeeting that I had.
15    Q.      You filled this out on March 8th, 2018,
16  correct?
17    A.      Yes.
18    Q.      At any time between March 8, 2018 and any
19  time between then and meeting with your attorneys --
20  and don't tell me anything about when you met with
21  your attorneys or what you discussed -- did you ever
22  see this or look at this form again?
23    A.      No.
24    Q.      Is this a form -- a preprinted form, a
25  hospital form?

1    A.      Yes.

2    Q.      Can you tell me what it is?

3    A.      It's a procedural consent for a

4    thoracentesis.

5    Q.      Is that your signature on the second

6    page?

7    A.      Yes.

8    Q.      And above that, is that Brandy Millan's

9    signature?

10   A.      Yes.

11   Q.      Did you sign that signature -- did you

12   sign this on March 8th at approximately 8:10 a.m.?

13   A.      Yes.

14   Q.      Did Ms. Millan sign it at about the same

15   time?

16   A.      Yes.

17   Q.      And then is that your handwriting above

18   Ms. Millan's signature where it says, Jack Raymond,

19   husband, via phone?

20   A.      Yes.

21   Q.      Did you insert those words?

22   A.      Yes.

23   Q.      At about 8:10 a.m.?

24   A.      Yes.

25   Q.      Back to the first page where you and

1    Hoffman and Lieberman are listed, is that in your

2    handwriting?

3    A.      Yes.

4    Q.      And the next paragraph or the box for the

5    right is checked, is that your --

6    A.      Yes.

7    Q.      That's your check?

8    A.      That's my check.

9    Q.      So you're the only one that filled this

10   form out, correct?

11   A.      Other than Brandy signing, yes.

12   Q.      Correct.

13   A.      I believe she wrote Diane Raymond on the

14   top of the first page, as well.  That's not my

15   handwriting.

16   Q.      Thank you.

17          Tell me what you did, as best you

18   recall, to obtain this consent.

19   A.      I don't specifically have any

20   recollection of obtaining this consent.  But my

21   practice would be, if we determined that phone

22   consent is necessary, to call the patient

23   representative listed in the chart.

24          I would call and introduce myself.

25   My name is Carin, I'm a physician assistant at Lehigh

1    Valley Hospital.  May I please speak with Jack

2    Raymond.  Confirm that that was who I am speaking to.

3          I'm calling regarding Diane

4    Raymond.  I've been asked to do a procedure called a

5    thoracentesis on her.  That means to drain fluid from

6    around her lung.  What that entails is that she would

7    come down to the radiology department.  We will

8    position her appropriately.  Take a look at her back

9    with an ultrasound machine.

10          If we find fluid, make a small

11   mark, clean her up, numb her up, and advance a needle

12   in between her ribs, into that fluid, draining out as

13   much as we can sending any testing that the doctors

14   have ordered.

15          All procedures carry risk.  I have

16   to tell you about the risks of the procedure.  Risks

17   are bleeding, infection, that goes with any time that

18   needles go under the skin.  There are blood vessels

19   that run along the ribs.  They should be protected;

20   but if anatomy is unusual, we wouldn't be able to see

21   that.  There is a chance that they can become

22   inadvertently injured.

23          There is also a chance of something

24   called a pneumothorax, which is air getting trapped

25   outside the lung.  If she were to suffer

1    complications, she could have to undergo additional

2    procedures to repair anything that would become

3    inadvertently injured.

4    Q.      What you just recited, is that what you

5    believe you said to Mr. Raymond?

6    A.      That is my typical consent for a

7    thoracentesis.  I would then offer the person

8    opportunity to ask any questions about the procedure

9    itself.  Knowing that Amanda was there that day, I

10   would make the patient representative aware that it

11   would be myself or one of my partners doing the

12   procedure, depending on availability.  And that's

13   kind of my consent process.

14   Q.      Okay.  And I appreciate that detailed

15   process.

16          My question though is, you said

17   that's typically what you would do for a

18   thoracentesis --

19   A.      Yes.

20   Q.      -- consent.

21          Do you believe that's what you did

22   with Raymond?

23   A.      Yes.

24   Q.      Did you write down anything about the

25   consent, other than what is in Exhibit 2?

1  thoracentesis, so it's not applicable.
2  Q.       Well, under there it says these
3  procedures may involve the use of x-rays, right?
4  A.       We don't use x-ray for a thoracentesis.
5  Q.       Okay.
6  A.       It says, if my procedure requires
7  radiation.  It doesn't.
8  Q.       How about the next paragraph, consent for
9  blood and blood products?
10  A.       We did not discuss that, as I did not
11  intend to give her any blood products as a result of
12  the procedure.
13  Q.       It is not you that didn't intend, you
14  weren't going to do the procedure, right?
15          MS. SHANNON:  Objection to the
16  form.
17          MR. WILHELM:  She said, I didn't
18  intend to use blood products.
19  A.       Blood products are not part of a
20  thoracentesis.
21  Q.       Okay.  How about the next paragraph
22  regarding tissue and organs and body parts?
23  A.       Again, not applicable.
24  Q.       So you don't believe you mentioned that?
25  A.       No.

1  Q.       What about the next part about medical
2  research?
3  A.       Again, not -- we don't -- there's no
4  research involved.
5  Q.       Okay.  And how about the HIV testing?
6  A.       Did not discuss that.
7  Q.       Okay.  So no reason to believe you
8  discussed anything from -- on this first half of this
9  page?
10  A.       Correct.
11  Q.       Now, signatures, did you discuss with him
12  about signing this at all or that -- or whether he
13  had an opportunity to come in and sign it at a later
14  time?  Was there any discussion about him putting a
15  signature on this?
16  A.       Not specifically that I recall.
17  Q.       Okay.
18  A.       But he would have been asked to give
19  consent over the phone.
20  Q.       And do you recall that he actually gave
21  the consent?
22  A.       I don't recall having the conversation,
23  but I wouldn't have written it down if he didn't.
24  Q.       Okay.  To your knowledge, are there any
25  other consent documents related to this specific

1  procedure for Ms. Raymond?
2  A.       No.
3  Q.       Why did you not attempt to obtain consent
4  from Mrs. Raymond?
5  A.       It was communicated to me that -- by the
6  nursing staff that she was not able to give her own
7  consent.
8  Q.       Okay.  Do you know who specifically
9  communicated that to you?
10  A.       I specifically don't recall the
11  conversation.  It was probably Brandy, since she was
12  the person assigned to the area that day.
13  Q.       As of 8:10 a.m. that morning, you had not
14  physically observed Mrs. Raymond, is that correct?
15  A.       Correct.
16  Q.       Did you see Mrs. Raymond physically,
17  after you obtained consent up until the time the
18  procedure started?
19  A.       No.
20  Q.       Do you know what time the procedure
21  started?
22  A.       I believe around 9:30, you told me
23  earlier.
24  Q.       Other than what I told you, do you know
25  when the procedure started?

1  A.       Not specifically.
2  Q.       Besides Brandy Millan, was there
3  anybody -- and you, was there anybody else involved
4  in obtaining Mr. Raymond's consent, to your
5  knowledge?
6  A.       Not to my knowledge.
7          (Exhibit Number 3 was marked for
8  identification.)
9  BY MR. WILHELM:
10  Q.       Let's go to Exhibit 3, please.  Do you
11  know what Exhibit 3 is?
12  A.       Yes.
13  Q.       What is it?
14  A.       It's a progress note that I wrote on
15  March 8th.
16  Q.       Have you seen this progress note
17  previously?
18  A.       Yes.
19  Q.       And when have you seen it?
20  A.       I seen it today, when I wrote it and the
21  pre -- with my counsel, prior to this meeting.
22  Q.       So any time between March 8th, 2018, when
23  you wrote it, and before meeting with your attorneys
24  at any time, did you see the progress note?
25  A.       I don't believe so.

17 (Pages 62 - 65)

*EXHIBIT "C"*

**LEHIGH VALLEY HOSPITAL**
ALLENTOWN, PA

**LEHIGH VALLEY HOSPITAL – MUHLENBERG**
BETHLEHEM, PA





SEX: F

**RAYMOND, DIANE**

MRN: ███   CSN: ███

DOB: ███ (76 yrs)   ███   **HERE**

## RADIOLOGY
## CONSENT FOR SURGERY / INVASIVE PROCEDURE

CHART/FORM LABEL

| PATIENT  *Raymond, Diane* | DATE | TIME | AM/PM |

I agree (consent) to Dr. Hoffman / Minchew, PAC / Lieberman and skilled assistants, including resident doctors and/or doctor assistants to do a(n):
Thoracentesis

- I understand that the procedure is to be performed at a teaching hospital and may involve resident doctors, medical students and other students and providers under the direction of my doctor.

The above treatment/surgery: ☒ right   ☐ left (if it applies) will be done for the care and diagnosis of:
Pleural fluid

My doctor(s) may need to do other procedures during this surgery or treatment. This could happen if they find an unexpected condition. If my doctor(s) feel this is needed, I agree to these added procedures.

**Sedation and Anesthesia**
I have been told that pain during my procedure will be kept under control by the use of medications, including local anesthetics, intravenous sedating medications or drugs to put me to sleep (general anesthesia).

- I understand during certain procedures my physician will give me medicines for pain and that I will be awake for the procedure. I further understand that in some instances during my procedure my physician may determine help from an anesthesia provider is needed. I give permission for this care.
- I understand that the anesthesia used to sedate me or put me to sleep during surgery (general anesthesia) is not under the control of my surgeon.
- I will talk with the anesthesiologist about the risks and benefits of the specific anesthesia that will be used.

I understand the purpose of the procedure/surgery and my need for treatment. I know the practice of medicine and surgery is not an exact science. I know that no promises have been made about the outcome of this procedure/surgery.

**Risks**
The following general risks with this procedure/surgery have been explained to me. These risks include but are not limited to:
1. infection
2. bleeding
3. injury to surrounding structures
4. death



**Additional Risks**
I understand the additional risks and results for this procedure/surgery may include:
Pain, pneumothorax (collapsed lung) which may require chest tube placement and admission to hospital

**Benefits**
The following benefits for this procedure/surgery have been explained to me. These benefits include but are not limited to:
To remove fluid from chest (around lung)

**Other Options (alternatives)**
I have been told about other treatment choices. These include, but are not limited to:

MRD-RAD-12 Rev 12/15                    SIDE 1 OF 2                    BATES
                                                                      LVH 12.

LEHIGH VALLEY HOSPITAL
ALLENTOWN, PA

LEHIGH VALLEY HOSPITAL – MUHLENBERG
BETHLEHEM, PA

SEX:F

RAYMOND,DIANE
MRN: ▮▮▮▮   CSN: ▮▮▮▮   RE
DOB: ▮▮▮▮   (76 yrs)

## RADIOLOGY
## CONSENT FOR SURGERY / INVASIVE PROCEDURE

CHART/FORM LABEL

### If my procedure requires Radiation:
- These procedures may involve the use of x-rays. Due to the occasional prolonged nature of some of these procedures, there is a possibility of skin reactions in the area receiving the x-rays. These reactions are usually temporary and may cause reddening of the skin or hair loss. These reactions are often delayed and may not occur until two to four weeks following your procedure.

### Consent for Blood and Blood Products
I understand that blood and/or blood products may be given during this procedure. My doctor has explained to me:
- The possible benefits of receiving blood and blood products.
- The risks of receiving blood and/or blood products.
- The complications of receiving blood and/or blood products.

### Consent for Use of Tissue, Organs, and Body Parts
I ask and agree that the hospital dispose of / get rid of any body tissues or parts which may be removed during my procedure. I understand that any body tissues or parts surgically removed may be tested and kept by the hospital for medical, scientific, or teaching purpose and may be disposed of as stated by law, regulation and/or normal practice.

### Consent to Take Part in Medical Research, Study or Education Related To My Care
- I agree (consent) to the possible photographing and/or televising of the procedure to be performed provided that my identity is not revealed by the pictures or words.
- I waive (give up) my right to inspect and/or approve the finished product and its specific use.
- I know that Lehigh Valley Hospital and Lehigh Valley Hospital – Muhlenberg are teaching hospitals. To advance medical education, I also agree to allow observers, technical representatives and participants in the operating room. I also understand that I may have a physical exam for educational reasons.

### Consent for HIV testing
- ☐ If any healthcare provider is exposed to my blood, I agree (consent) in advance to the taking of blood samples for HIV testing prior to, during or after the course of my procedure. I have been given the option to opt out of this testing. If I decline testing, this section will not be checked.

### Signatures
I understand that I may withdraw my permission (consent) for this procedure/surgery at any time before it is performed. My signature below means that:
- I have read and understand this consent form.
- I have been given all the information I asked for about the procedure/surgery, the risks and other options.
- All my questions were answered.
- I agree to everything explained above.

Jack Raymond (husband) via phone

| Patient Signature (or authorized Representative) | Date 3/8/18 | Time 0810 |

Witness to signature (Required if patient or authorized representative is unable to sign or signs with a mark)   Date 03-08-18   Time 0810

I have discussed the procedure with the patient or the patient's authorized representative and have answered all questions asked.

Provider Signature   Date 3/8/18   Time 0810

If it applies, the above information was translated and/or the consent was read in _____ language by _____ (Print Interpreter Name).

Interpreter's Signature (if it applies): _____ Date _____ Time _____

MRD-RAD-12 Rev 12/15          SIDE 2 OF 2          BATES

*EXHIBIT "D"*

Page 10

1    Q.    Where do you live?
2    A.    Easton, Pennsylvania.
3    Q.    What's your address?
4    A.    My billing address and my mailing
5    address is ███████████████████████
6    Pennsylvania, 18042.
7    Q.    Thank you.
8          And your date of birth, please?
9    A.    ████████
10   Q.    Did you go to high school?
11   A.    I did.
12   Q.    Where did you attend and when did you
13   graduate?
14   A.    I attended Easton Area High School and
15   graduated in June of 1991.
16   Q.    Have you ever been adjudicated a
17   delinquent?
18   A.    No.
19   Q.    Have you ever been arrested as an adult
20   for a criminal offense?
21   A.    Never.
22   Q.    Do you have a driver's license?
23   A.    I do.
24   Q.    In Pennsylvania?
25   A.    Yes.

Page 11

1    Q.    Has that driver's license ever been
2    suspended or revoked?
3    A.    Never.
4    Q.    Have you had that license since
5    approximately age 16?
6    A.    Yes, since approximately age 16.
7    Q.    And have you ever had a driver's
8    license in any other state?
9    A.    I have not.
10   Q.    Did you attend college?
11   A.    I did.
12   Q.    Where?
13   A.    My first degree I attended South
14   Carolina State University.
15   Q.    Okay.  And what years did you attend
16   there?
17   A.    From August of 1991 until December of
18   1994 when I graduated.
19   Q.    And what did you graduate with?
20   A.    A bachelor's of science degree in
21   psychology.
22   Q.    Did you -- and then did you have formal
23   education after that?
24   A.    I did.
25   Q.    Where?

Page 12

1    A.    I attended Northampton Community
2    College where I received my associate's degree
3    in nursing.
4    Q.    What year was that?
5    A.    I went back -- oh, I can't remember the
6    year I went back, but I graduated in December of
7    2004.
8    Q.    It appears to me you obtained your
9    nursing license in 2005 in Pennsylvania.  Is
10   that accurate?
11   A.    Correct.
12   Q.    So just generally, what did you do
13   between '94 and when you attended nursing
14   school?  What kind of work did you do?
15   A.    I worked in children's mental health
16   for approximately 10 years.  I had a position as
17   a TSS or therapeutic support staff with
18   the IU 21.  And then I was employed with
19   KidsPeace for almost 7 years.
20         And when I left there in May of '90 --
21   no.  I started -- I left there May of 2004.
22   That's when I started working here.  It's been
23   so long, so I'm, like, trying to get all my
24   dates --
25   Q.    That's okay.

Page 13

1    A.    -- together.  So, yes, June of 2004 is
2    when I started my employment with Lehigh Valley
3    Health Network.
4    Q.    Okay.  Great.  Have you remained a
5    nurse in Pennsylvania from 2005 to the present?
6    A.    Yes.
7    Q.    Has your nursing license ever been
8    revoked or suspended?
9    A.    Never.
10   Q.    Have you met all the qualifications and
11   requirements in that roughly 16-year period to
12   remain a nurse?
13   A.    I have.
14   Q.    And have you ever had a nursing license
15   in any other state?
16   A.    I have not.
17   Q.    So you already indicated that you
18   started working at LVHN around 2004, is that
19   correct?
20   A.    That's correct.
21   Q.    And have you remained in their employ
22   continuously since then?
23   A.    Yes.
24   Q.    As a nurse?
25   A.    When I first started employment in

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 18

1 be the exhibit, what you can tell.
2 THE WITNESS: So based on the
3 information that I've been provided, I'm aware
4 that Diane Raymond was a patient in the
5 interventional radiology. I do see, based on
6 the document that I have before me, that I did
7 witness the consent with one of my colleagues
8 with the spouse via telephone.
9 (Goodwin Exhibit 1 was marked for
10 identification.)
11 BY MR. WILHELM:
12 Q. And do you have a two-page document in
13 front of you?
14 A. Yes, I do.
15 Q. And the document at the top left would
16 say radiology consent for surgery/invasive
17 procedure?
18 A. Yes, it does.
19 Q. And then the patient's identified as
20 Diane Raymond, correct?
21 A. Well, Raymond, Diane.
22 Q. And on the second page, there's a place
23 which appears as though your signature is, is
24 that correct?
25 A. Yes.

Page 19

1 Q. Is that in fact your signature?
2 A. That is my signature.
3 Q. Did you in fact sign that on March 8th,
4 2018, at approximately 8:10 a.m.?
5 A. To the best of my recollection.
6 Q. And whose signature is below you?
7 A. Carin Minchew, physician assistant.
8 Q. Do you know Carin Minchew?
9 A. I do.
10 Q. How do you know Carin?
11 A. Through employment. We worked together
12 in the interventional radiology department.
13 Q. Okay. So based upon this document,
14 tell me what you recall, if anything, about your
15 role in the consent here.
16 A. Based on this document, what would have
17 occurred during that day is Carin would have
18 been on the telephone with the documented
19 spouse, Jack Raymond, reviewing the consent for
20 the procedure, which is noted as a right
21 thoracentesis.
22 Based on the consent form, Carin would
23 have been speaking with Mr. Raymond via
24 telephone, and I would have been present nearby
25 listening to her review the consent form and all

Page 20

1 the pertinent parts related to a thoracentesis.
2 After she finished reviewing everything
3 with him, she would have handed me the
4 telephone. I would have got on with Mr. Raymond
5 and asked him if he agreed to all that was
6 discussed with him by Carin, did he have any
7 further questions.
8 I would have presumed he didn't have
9 any further questions because I signed. I
10 wouldn't have signed without him expressing to
11 me that he was in agreement with everything that
12 Carin reviewed with him, and then I signed my
13 name, date, and time then.
14 Q. Do you believe that's what occurred?
15 A. I believe that's what occurred.
16 Q. Okay. And you believe that's what
17 occurred because that's customarily how it's
18 done based on your experience?
19 A. Based on my experiences, yes.
20 Q. Okay. When Carin would have been
21 speaking with Mr. Raymond on the telephone,
22 would you only have been able to hear -- to hear
23 her side of the conversation?
24 A. That's correct.
25 Q. But you would have been present during

Page 21

1 the entire conversation, you believe?
2 A. Yes.
3 Q. Where -- where would you and Carin have
4 been?
5 A. In the IR suite at the time, there was
6 a desk where the staff would sit where the
7 telephone was at, so we would have both been
8 behind the desk. So I would have been sitting
9 very near to her so I could hear clearly
10 everything that she was reviewing so that when I
11 was on the phone, I could be clear as to what
12 she had said so if there was not any
13 understanding when I asked prior to me signing,
14 that I know what she reviewed with him.
15 Q. Was Carin filling out this form when
16 she was speaking with Mr. Raymond? Do you know?
17 A. I don't recall.
18 Q. Okay. So I asked a few moments ago if
19 you signed this around 8:10. You said -- I
20 think you said likely that you did. Is that
21 about the time the telephone conversation would
22 have taken place?
23 A. Correct.
24 Q. So are you required to fill out the
25 consent form at the same time as soon as the

6 (Pages 18 - 21)

*EXHIBIT "E"*

Page 22

1  the way of writings in professional literature?
2  A.    I don't. I'm more of a clinical
3  physician.
4  Q.    Okay. So on your CV, you have some
5  references to writings that you did. It looks
6  like mostly in the late '90s, early 2000. Is
7  that a fair summary of your professional
8  writings?
9  A.    Yeah. I think there's -- yeah.
10  There's kind of two kind of writings. There's,
11  you know, research kind of writings and then
12  there's lecturing. I do occasional lectures,
13  but I don't participate in research.
14  Q.    Okay. And do you do any teaching on
15  any kind of regular basis?
16  A.    Not on a regular basis. We will
17  occasionally have medical students rotate
18  through our department, and I do do some
19  teaching to the medical students.
20  Q.    But you're not formally an instructor
21  or a professor?
22  A.    I am not.
23  Q.    All right. Thank you.
24      Again, is there anything that's not on
25  your CV that you think is relevant to your

Page 23

1  education, training, and experience?
2  A.    I don't think so.
3  Q.    Okay. Thank you.
4      So let's talk about where you work.
5  You work for whom?
6  A.    I work at Lehigh Valley Hospital. We
7  are a private practice group employed by Lehigh
8  Valley Hospital.
9  Q.    Okay. What's the name of the private
10  practice group?
11  A.    Medical Imaging of Lehigh Valley.
12  Q.    And then the practice group is employed
13  by the hospital?
14  A.    Correct.
15  Q.    So what is your position? Are you a
16  radiologist or an interventional radiologist?
17  How are you identified?
18  A.    As an interventional radiologist.
19  Q.    Okay. Did you ever work for a place
20  called Lehigh Magnetic Imaging Center?
21  A.    Well, that's -- it gets kind of
22  complicated. That's one of the subsets of our
23  private practice group. I don't understand
24  necessarily how the entities -- why they differ,
25  but it's a subgroup of our private practice

Page 24

1  group.
2  Q.    So Lehigh Magnetic Imaging Center is a
3  subgroup of --
4  A.    I don't know if I'm using the right
5  terminology.
6      MS. SHANNON: That's okay. I just
7  wanted to -- he was talking and you were trying
8  to be helpful but --
9      THE WITNESS: Sorry, Scott. I
10  apologize.
11      MR. WILHELM: Oh, no, no. Not
12  necessary.
13      MS. SHANNON: Sorry to Meg.
14      THE WITNESS: Oh, sorry, Meg.
15  BY MR. WILHELM:
16  Q.    Explain to me as best you understand.
17  A.    Yeah. This is like a business
18  arrangement that's out of my realm of expertise,
19  but the magnetic imaging portion is MRI, and
20  that's part of our private practice group, but,
21  in a way, it's a distinct entity.
22  Q.    Okay.
23  A.    That's the best I can describe it to
24  you without getting into the business details.
25  Q.    So -- okay. Who is -- who is your

Page 25

1  employer? Is it Medical Imaging or is it Lehigh
2  Valley Hospital?
3  A.    I'm an employee of Medical Imaging of
4  Lehigh Valley who is employed by Lehigh Valley
5  Hospital.
6  Q.    So your pay stub, it comes from -- I'm
7  sorry?
8  A.    It comes from MILV.
9  Q.    Thank you.
10      So you're an interventional
11  radiologist -- radiological physician, right?
12  A.    That's correct.
13  Q.    You don't identify yourself as a
14  radiologist or a diagnostic radiologist, is that
15  correct?
16  A.    I mean, I am a radiologist, but my
17  specific area of training and fellowship
18  training is interventional radiology.
19  Q.    Okay. So besides diagnostic radiology
20  and interventional radiology, are there any
21  other subsets of radiology that a physician
22  could get into?
23  A.    There are. There are multiple
24  different subspecialties.
25  Q.    Can you give me an example of a few?

7 (Pages 22 - 25)

1    A.    No -- for pregnancy.
2    Q.    Okay.  So have you had an opportunity
3    to work with Ms. Lieberman?
4    A.    Fairly extensively.
5    Q.    Okay.  Can you explain that?
6    A.    So, I mean, since she's been here since
7    2012, I've, you know, observed her doing
8    procedures.  I've been her supervisor during
9    procedures as it was in -- you know, like the
10   situation at Muhlenberg that particular day,
11   and, you know, just getting to know her since
12   that time, getting her reputation.
13   Q.    Okay.  So let's talk about her
14   reputation.  Where have you obtained information
15   regarding her reputation?
16   A.    Anecdotally, I suppose.  I mean, I know
17   she's very, very good; I know she's very, very
18   smart, and, you know, sometimes you learn that
19   just by working with someone.
20   Q.    So you're --
21   A.    She had extensive experience before she
22   came to us.
23   Q.    So your opinion of her is based upon
24   what you've observed and what you heard about
25   her?

1    A.    Correct.  Yes.
2    Q.    Can you give a fair estimate as to how
3    many times you worked -- days you worked with
4    her?  For instance, you work five days a week
5    generally.  Can you give me an idea of how many
6    times you worked with her?
7    A.    Usually about once a week.
8    Q.    And has that always been the case?
9    A.    That's pretty consistent.
10   Q.    Has -- to your knowledge, has
11   Ms. Lieberman ever participated in a procedure
12   that you've done where you're the performing
13   physician and she's there assisting in some
14   manner?
15   A.    Not to my knowledge.
16   Q.    Would that be -- would that be unusual
17   to have a physician --
18   A.    Yes.  That would be kind of unusual.
19   We just don't have that type of arrangement or
20   necessity.
21   Q.    Have you ever observed her perform her
22   procedures, you know, going into the room and
23   actually watched her?
24   A.    I have.
25   Q.    Can you give a fair estimate as to how

1    many times you've done that?
2    A.    Dozens.  Again, that's a hard one to
3    answer.  I don't know -- that's an approximate
4    but dozens.
5    Q.    Have you ever actually been in the room
6    and observed her perform a thoracentesis other
7    than anything related to Ms. Raymond?
8    A.    Yes.
9    Q.    Can you give me a fair estimate there?
10   A.    Same.
11   Q.    Besides your co-workers, do you --
12   strike that.
13         A moment ago you spoke about her
14   reputation based upon what you've seen and what
15   you've observed.  Have you ever observed
16   anything that she's done professionally that
17   concerned you?
18         MS. SHANNON:  Object to the form.  Go
19   ahead.
20         THE WITNESS:  Absolutely not.  She's
21   very thorough.  She's very smart.  She's
22   technically skilled.  I mean, she's really one
23   of the best we have, if not the best.
24   BY MR. WILHELM:
25   Q.    Have you ever heard any of your

1    colleagues, other physicians, comment on her
2    negatively, her skills or performance?
3    A.    No.  I mean, everyone shares my -- my
4    view.  She's -- I think we're lucky to have her.
5    Q.    Has your employer or the hospital ever
6    asked you to review her in any type of formal
7    manner?
8    A.    No.
9    Q.    How about informally?  Has anybody come
10   and questioned you about her proficiency and
11   competency, et cetera?
12   A.    No.
13   Q.    Do you know when the last time was that
14   you worked with her prior to March 8th, 2018,
15   which, of course, is the date that's the subject
16   of this case?
17   A.    When did I work with her prior to that
18   date?
19   Q.    Yes.  Last, last prior to March 8th, do
20   you remember?
21   A.    No, I actually don't.  But, again, it's
22   usually that once-a-week arrangement.  It's
23   usually Thursday, so the Thursday before that
24   procedure.
25   Q.    Okay.

25 (Pages 94 - 97)

*EXHIBIT "F"*

Page 14

1   A.   Yes.
2   Q.   And how often do you take them?
3   A.   Thirty hours for two years.  We renew
4   our license every two years.
5   Q.   Okay.  And you've renewed it every two
6   years without incident, is that correct?
7   A.   Yes.
8   Q.   And are you a member of any
9   professional organizations related to the
10  nursing field?
11  A.   No.
12  Q.   So who is your current employer?
13  A.   Lehigh Valley Hospital.
14  Q.   And when did you start there?
15  A.   1995.
16  Q.   Okay.  Have you been employed by
17  anybody else in the medical field from 1995 to
18  the present other than Lehigh Valley?
19  A.   No.
20  Q.   What was your first position at Lehigh
21  Valley?
22  A.   A student nurse.
23  Q.   Okay.
24  A.   It was a program.
25  Q.   Okay.  So your pay stub, it says Lehigh

Page 15

1   Valley Health Network on it or something like
2   that?
3   A.   Yes.
4   Q.   Just give me a summary of the jobs that
5   you've had from the time you started there in
6   the last 25 years.
7   A.   A technical partner is when I was done
8   with school and before I was able to sit for my
9   boards.  We'd take temperatures and blood
10  pressures, phlebotomy, little bit of charting --
11  Q.   Okay.
12  A.   -- and basic needs of the patients, you
13  know, water, bedpan, help them change their
14  clothes.  And then once I passed my boards,
15  that's when I started working as an RN.
16  Q.   Okay.  And tell me, were you assigned
17  to different areas in the hospital, different
18  departments?  Kind of give me a history of that.
19  A.   As a student and when I first passed my
20  boards, I worked in the emergency room.
21  Q.   Okay.  And then?
22  A.   And then in 2000, the year 2000, I
23  accepted the position at Muhlenberg in
24  interventional radiology.
25  Q.   And is that the position you hold

Page 16

1   today?
2   A.   Correct.
3   Q.   And have you held that position then
4   for the approximate 20 or 21 years?
5   A.   Yes.
6   Q.   Do you work only at Muhlenberg?
7   A.   We do rotate over to the Cedar Crest
8   site on occasion.
9   Q.   Okay.  So tell me generally what your
10  job duties as an interventional radiologist --
11  and I'll say IR for shorthand, if that's okay
12  with you.  As an IR nurse, generally what are
13  your duties?
14  A.   Sedation for procedures, assist in the
15  procedures with the physician or the physician
16  assistant, charting, monitoring -- that goes
17  along with the sedation -- calling report, and
18  tending to the care of the patient, addressing
19  any pain or basic needs --
20  Q.   Okay.
21  A.   -- and emotional support as well.
22  Q.   Okay.  Do you have a current nursing
23  supervisor?
24  A.   Yes.
25  Q.   Okay.  And who would that person be?

Page 17

1   A.   Tracie DeCrosta.
2   Q.   Can you spell the last name for the
3   court reporter?
4   A.   T-R-A-C-I-E, DeCrosta, D-E-C-R-O-S-T-A.
5   Q.   Thank you.
6       And how long has she been your
7   supervisor now?
8   A.   I believe since November she -- she
9   just kind of took over our -- our area.  She
10  currently is the manager at the Cedar Crest
11  site.
12  Q.   Okay.  Do you know who your nursing
13  supervisor was back in March of 2018?
14  A.   Dawn Kuklinski.
15  Q.   Could you spell that?
16  A.   Yes, D-A-W-N, K-U-K-L-I-N-S-K-I.
17  Q.   So in the 20 -- approximately 20
18  years you've been in IR, have you always been
19  employed?  In other words, were you ever laid
20  off or did you ever quit or take time off?
21  A.   Just for pregnancy.
22  Q.   Okay.  And have you ever been suspended
23  by the hospital in these last 20 years?
24  A.   No.
25  Q.   Have you ever received any formal

5 (Pages 14 - 17)

Page 22

1  ultrasound -- ultrasound-guided thoracentesis
2  is?
3  A.      Yes.
4  Q.      What's your understanding of what that
5  is?
6  A.      You use the ultrasound machine as a
7  guide to find a pocket of fluid.
8  Q.      And when you say you, who uses that
9  ultrasound machine?  Is it the nurse or the
10  proceduralist or somebody else?
11  A.      The proceduralist.
12          (Unser Exhibit 1 was marked for
13  identification.)
14  BY MR. WILHELM:
15  Q.      So the exhibits I sent to you, which I
16  believe you have in front of you --
17  A.      Yes.
18  Q.      -- Exhibit Number 1 is three pages.  Do
19  you have that?
20  A.      Yes.
21  Q.      Now, do you see where it says Lehigh
22  Valley Hospital Department of Ultrasound
23  protocols?
24  A.      Yes.
25  Q.      And then the first page is, like, a

Page 23

1  table of contents.  Would you agree?
2  A.      Yes.
3  Q.      And then the next two pages are pages
4  18 and 19 which address thoracentesis, correct?
5  A.      Yes.
6  Q.      Have you seen this document -- these
7  parts of this document previously?
8  A.      Yes.
9  Q.      Okay.  When is the last time that you
10  saw it?
11  A.      I don't know.  A while.
12  Q.      Okay.  That's fine.  Do you know when
13  is the first time you saw it?
14  A.      Probably during my training.  It
15  probably has changed since then as far as --
16  probably when we got the Neptunes.
17  Q.      And what is the Neptunes?
18  A.      If I can guess.  If I can guess.
19          MS. WEED:  Don't guess.
20          THE WITNESS:  Oh, don't guess.  If I
21  could --
22  BY MR. WILHELM:
23  Q.      All right.
24  A.      The Neptunes are the big containers
25  that collect the fluid.

Page 24

1  Q.      So you acknowledge you've seen this;
2  you just don't know when the last time you saw
3  it is?
4  A.      Right.
5  Q.      Do you know who drafted this document?
6  A.      No.
7  Q.      Did you play any role in drafting this
8  document?
9  A.      No.
10  Q.      Have you ever been tested on this
11  document?
12  A.      No.
13  Q.      To your knowledge, are you required to
14  commit this document to memory?
15          MS. SHANNON:  Object to the form.
16          MS. WEED:  Yes.  I'm joining in that
17  objection.
18          MR. WILHELM:  What's the objection?
19          MS. WEED:  The term required.
20  BY MR. WILHELM:
21  Q.      Required.  Does your employer require
22  you to memorize this document?
23  A.      Memorize it?
24  Q.      Yes.
25  A.      Do you mean word for word or --

Page 25

1  Q.      In any manner.
2          MS. WEED:  She's confused by the
3  question.  I can tell.
4          THE WITNESS:  I don't know what you
5  mean by -- I mean, I can recall the process, but
6  not that I need -- I don't know.  I guess I'm
7  confused.
8  BY MR. WILHELM:
9  Q.      That's fine.  Ms. Unser, if at any time
10  you're confused, just speak up.
11  A.      Okay.
12  Q.      So what I'm asking is, are you aware --
13  let's try it this way -- of your employer
14  advising you that you must commit this document
15  to memory?
16          MS. WEED:  Objection.  You can answer.
17          MR. WILHELM:  What's the objection?
18          THE WITNESS:  Ah, no.
19          MR. WILHELM:  Well, hold on.  Okay.
20  BY MR. WILHELM:
21  Q.      Have you -- strike that.
22          So let's go to the second page which is
23  page 18.  Do you see that?
24  A.      Yes.
25  Q.      Okay.  So at the top it says,

7 (Pages 22 - 25)

Page 26

1    Thoracentesis:  Suction regulator should be set
2    to 100 millimeters mercury.
3        Is that what it says?
4    A.    Yes.
5    Q.    And what does that mean?
6    A.    That's the setting on the Neptune
7    machine.
8    Q.    Okay.  Is that something that the IR
9    nurse is responsible for?
10   A.    Yes.
11   Q.    Then next it has a list of supplies,
12   and it looks like there's about 15 -- excuse me,
13   roughly 15.  Do you see that list?
14   A.    Yes.
15   Q.    Is that your understanding -- when you
16   say getting the tray, the supplies would be on
17   that tray?
18   A.    Yes.
19   Q.    Okay.  Is that something that the IR
20   nurse is responsible for?
21   A.    Yes.
22   Q.    And then where, as the IR nurse, do you
23   get these supplies?
24   A.    We have a sterile tray that has some
25   basic supplies on it, and the rest of the

Page 27

1    supplies we get from our clean supply room.
2    Q.    Okay.  Now, take a moment to look at
3    this list of items and tell me if that's
4    consistent with your experience as to the items
5    that you need to get.
6    A.    Yes.
7    Q.    Are there any items that are not on
8    that list that you -- that you retrieve for the
9    procedure or is that --
10   A.    Can you repeat that?  I'm sorry.
11   Q.    Sure.  Is that a complete list based on
12   your experience or are there other items that --
13   other supplies that are not on that list that
14   are used in a thoracentesis?
15   A.    No.  This is what we use.
16   Q.    Okay.  And then the next section says
17   paperwork.  Do you see that?
18   A.    Yes.
19   Q.    And then it says consent form.  Is it
20   the IR nurse's duty to check the consent form?
21   A.    Yes.
22   Q.    Okay.  And what do you do specifically
23   to check the consent?
24   A.    We look to make sure that there's
25   patient stickers on the form.  We also look at

Page 28

1    it to make sure that it's signed.
2    Q.    Okay.  So a consent form that's been
3    signed, where do you look for it, in the medical
4    chart or is it with the patient when they come
5    in to the procedure or something else?
6    A.    It's -- it's usually -- we have the
7    consents in our department, so it's either with
8    our paperwork at the nurse's desk.
9    Q.    That's typically where you find it?
10   A.    Yes.
11   Q.    Okay.  And the patient stickers, what's
12   the patient stickers?
13   A.    The patient's -- has the patient's name
14   and medical record number on it.
15   Q.    And then patient script, what's that?
16   A.    Patient script -- oh, the patient
17   script is the order for the procedure.
18   Q.    Okay.  And then lab stickers, what does
19   that reference?
20   A.    Lab stickers are stickers that print
21   out from a special lab printer, and they
22   identify the testing that was ordered.
23   Q.    Okay.  What's the difference between
24   lab stickers and patient script?
25   A.    The difference between lab stickers and

Page 29

1    patient script, patient script is an order for
2    the test.
3    Q.    Okay.  And the lab stickers is what?
4    Their lab -- the patient's lab results?
5    A.    No.  If you're sending fluid for
6    testing --
7    Q.    Okay.
8    A.    -- they're -- yeah.  They're like lab
9    labels, like when you go and get blood work.
10   Q.    I gotcha.  Thank you.
11       And then what's this lab -- I'm sorry.
12   What did you say?
13   A.    Nothing.
14   Q.    And then what's this next phrase,
15   non-GYN cytology form?
16   A.    That is a special test if you want to
17   send it for -- the fluid for cytology.  It's --
18   that test does not generate a lab sticker, so
19   you need to go into Epic, print out the order
20   for the cytology, and send it with the specimen.
21   Q.    Okay.  What is cytology?
22   A.    Looking for cancer, cancer cells.
23   Q.    All right.  And then the next section,
24   it says Epic chart.  Do you see that?
25   A.    Yes.

Page 30

1    Q.    And then it has some entries we're
2  going to discuss here.  Normal PT, what's that?
3    A.    Usually 2.0 and below.
4    Q.    Strike that.
5    A.    Oh, wait.  That's INR.  I apologize.
6    Q.    Hold on.  I didn't ask a good question.
7          What does normal PT stand for?
8    A.    Normal prothrombin time.
9    Q.    Pro what?
10   A.    Thrombin.
11   Q.    Okay.
12   A.    Normal blood clotting time.
13   Q.    Thank you.
14         Next, what's the PTT stand for?
15   A.    I don't remember.
16   Q.    If you don't remember, that's fine.
17   A.    It has to do with your blood clotting
18  time, your prothrombin.
19   Q.    And what's platelets?
20   A.    Platelets is the level in your blood to
21  make sure that you won't bleed.
22   Q.    Okay.  And then the next entry says,
23  INR-according to lab value and medication
24  guidelines, et cetera.
25         What's that phrase talking about?

Page 31

1    A.    It's your -- the international ratio,
2  that is when you were on a medication that
3  affects your blood clotting time.  That's a
4  value we look at.
5    Q.    And the INR stands for international
6  ratio.  Is that what you said?
7    A.    I believe -- yes, I believe so.
8    Q.    Okay.  Again, answer just to the best
9  of your knowledge.  If you truly don't know,
10  please just let me know.  I don't want you to
11  guess.  Okay?
12         Then the last phrase there, Patient
13  script (order) post orders will be entered in
14  Epic by the radiologist/PA.
15         What's that mean?
16   A.    Any orders after the procedure, whether
17  it is to resume medications or an x-ray, will be
18  done by -- by them.
19   Q.    Okay.  But not by the nurse?
20   A.    No.
21   Q.    Okay.  All right.  Next section says
22  patient prep.  Do you see that?
23   A.    Yes.
24   Q.    All right.  It says, Patient does not
25  need to be NPO.

Page 32

1          What does that mean?
2    A.    The patient does not have to stop
3  eating or drinking for the procedure.
4    Q.    And then the next phrase, Stop blood
5  thinners, what's that phrase talking about?
6    A.    There's blood thinners that sometimes
7  that -- there's blood thinners that need to be
8  stopped -- some blood thinners that need to be
9  stopped prior to having the procedure done.
10   Q.    Okay.  Do you play any role in checking
11  that as the nurse?
12   A.    Yes.
13   Q.    Okay.  And how do you check that?
14   A.    It's either in the chart -- it's in the
15  chart asking the patient or it's a conversation
16  that you have with the nurse taking care of the
17  patient.
18   Q.    Okay.  The next section, procedure
19  performed by, that's self-explanatory.
20         The next section, other support staff,
21  do you see that?
22   A.    Yes.
23   Q.    And then it says, Nurse to start
24  an IV (if necessary).
25         What does that mean?

Page 33

1    A.    We sometimes put in an IV to give
2  replacement fluid if it's needed or if we need
3  to draw blood work prior to the procedure, we
4  would start an IV to get the blood work off.
5    Q.    And would that be an order from the
6  physician then?
7    A.    Yes.
8    Q.    Next section, preprocedure, do you see
9  that?
10   A.    Yes.
11   Q.    And number 1, it says, Set up Neptune.
12  Right?
13   A.    Yes.
14   Q.    And there's a reference to the Neptune
15  protocol.  So is it accurate to say it's the IR
16  nurse's job to set up the Neptune?
17   A.    Yes.
18   Q.    Bring the patient into the room.
19  That's the IR nurse's responsibility?
20   A.    Yes.
21   Q.    Number 3, Setting up the patient,
22  that's self-explanatory.
23         Number 4 says, Go through the invasive
24  checklist in Epic, begin navigator.
25         What does that mean?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 34

1    A.    That is the invasive checklist we go
2  through.  It documents the -- who's in the room.
3  It documents if the patient has -- is on any
4  blood thinners, that we check the medications,
5  that the patient hasn't eaten or drank.  It's
6  basically a checklist for all the procedures we
7  do.
8    Q.    Okay.  And then next it says, Explain
9  the procedure to the patient.
10       Is that the job of the IR nurse?
11       MS. SHANNON:  Object to the form.
12       THE WITNESS:  Huh?  Oh.  We do -- we do
13  talk to the patient about the procedure.
14  BY MR. WILHELM:
15   Q.    So do you do that in all of your
16  thoracentesis; you explain the procedure to the
17  patient?
18   A.    Yes.
19       MS. SHANNON:  Object to the form.
20       MR. WILHELM:  Okay.  So -- okay.  Now,
21  Laurie and Jenny, you guys can object to the
22  forms all you want, but you know those
23  objections to form are preserved under the rules
24  of procedure, so you don't need to.  You can
25  continue to do it if you'd like, but they are

Page 35

1  preserved if you check the rules.
2       MS. SHANNON:  That was my objection to
3  the form.  I thought we had usual stipulations,
4  so I thought all objections other than form are
5  preserved and form objections need to be made.
6  That's my understanding of usual stipulations,
7  but if you have a different understanding, we
8  can --
9       MS. WEED:  That's my understanding of
10  the usual stipulations.
11       MR. WILHELM:  All right.  I understand
12  what you're saying now.  I'm just saying under
13  rule 30, they're -- they're automatically
14  preserved.
15  BY MR. WILHELM:
16   Q.    All right.  And then number 5, it says,
17  Scan patient's posterior chest and mark the
18  lowest rib space with the location of largest
19  area of fluid with marker.
20       Do you see that?
21   A.    Yes.
22   Q.    Is that what the IR nurse does?
23   A.    No.
24   Q.    Who does that?
25   A.    The provider -- the proceduralist,

Page 36

1  yeah.  Sorry.
2    Q.    No problem.
3       And then next, 6, Set up sterile tray,
4  including dropping additional supplies as
5  needed-wearing a surgical mask.
6       Is that the nurse's duty?
7    A.    Yes.
8    Q.    Okay.  And then 7, Call the radiologist
9  and/or PA for procedure.
10       So as the -- in your experience of
11  doing this, do you go through this checklist or
12  do the things that you need to do and then call
13  the proceduralist in or is the proceduralist in
14  the room when you're doing the things that you
15  need to do preprocedure?
16   A.    The proceduralist is usually in the
17  room.
18   Q.    Because number 5 and number 7, would
19  you agree -- or number 5 suggests that it's
20  going to be done before number 7, right?
21       MS. WEED:  Well, object to the form.
22  You can answer that.  That's a confusing
23  question.
24       THE WITNESS:  What do you mean?  The 7
25  should be before -- what's the question?

Page 37

1  BY MR. WILHELM:
2    Q.    Okay.  So maybe you've answered.
3  You're saying that the -- when you're going
4  through this preprocedure, the proceduralist is
5  usually in the room?
6    A.    Yeah.
7    Q.    Okay.  All right.  And then we'll go to
8  the next section where it says procedure, number
9  1, Ensure consent is filled out and signed after
10  the radiologist/PA explains the procedure to the
11  patient.
12       Do you see that?
13   A.    Yes.
14   Q.    So in your experience, does the
15  proceduralist explain the procedure to the
16  patient?
17   A.    Yes.
18   Q.    Is that in addition to the explanation
19  by the nurse which we -- which is referenced
20  above that we discussed?
21   A.    Yes.
22   Q.    Okay.  And it says, Ensure consent.  Is
23  that the same -- you spoke a few moments earlier
24  about the consent.  Is that ensuring the consent
25  again?  Or who is ensuring the consent there?

10 (Pages 34 - 37)

Page 38

1  A.    Let's see, it's a conversation that we
2  have with the proceduralist and the nurse.
3  Q.    Okay.  Talking amongst yourselves to
4  confirm that somebody's -- or to make sure
5  somebody's confirmed consent?
6  A.    Yes.
7  Q.    And then number 2, Perform radiology
8  timeout in Epic.
9        Can you explain what that is?
10  A.    The timeout is when you pause right
11  before the start of a procedure to ensure that
12  you have the correct patient, name, date of
13  birth, correct laterality --
14  Q.    Correct what?
15  A.    -- consent.  Laterality, the side in
16  which they're going to tap.  And we do -- we
17  also talk about the lab values and the
18  medications, if they were held, and then consent
19  is then again made sure.  That's part of it as
20  well, I believe.
21  Q.    Okay.  So it says, Perform radiology
22  timeout in Epic.
23        Are you as the nurse putting that
24  information into Epic at the same time you're
25  doing what you just said you're doing or --

Page 39

1  A.    We have bedside -- we have a computer
2  on wheels.
3  Q.    Okay.
4  A.    So the chart is open, and we can go
5  through it at the time --
6  Q.    Gotcha.
7  A.    -- as well.
8  Q.    Okay.  And number 3 is
9  self-explanatory.
10        Number 4, Assist doctor/physician
11  assistant with drawing up the lidocaine.  Okay.
12        The next, it says, Ultrasound tech will
13  assist doctor during the procedure as needed.
14        Do you see that?
15  A.    Yes.
16  Q.    Okay.  Is an ultrasound tech always in
17  the procedure room based upon your experience?
18  A.    Not at Muhlenberg.
19  Q.    Have you participated in thoracentesis
20  procedures where an ultrasound tech has been
21  present?
22  A.    Not that I can recall.
23  Q.    All right.  Number 5, Before hooking
24  the tubing to the patient end of the sterile 5-1
25  connector (Christmas tree tube

Page 40

1  adaptor)/connecting tube setup.
2        Explain to me what all that means.
3  A.    Let's see, one of the items that we
4  drop onto the tray is a connector tubing and the
5  5 in 1 connector, and they put the 5 in 1
6  connector into the end of the connecting tube.
7        And on the other side, there's a
8  little -- it's called a stopcock, and it has an
9  off-and-on position.
10  Q.    Okay.  Whose job is that?  Is it the IR
11  nurse or the proceduralist?
12  A.    The proceduralist.
13  Q.    Okay.  And then number 6, do you see
14  that?
15  A.    Yes.
16  Q.    Who's responsible for number 6, the IR
17  nurse or the proceduralist?
18  A.    Let's see, that's -- they kind of hand
19  off the end -- end of the connection tubing to
20  the nurse.  And we put it together, and then the
21  nurse would start the suction on the Neptune.
22  Q.    Okay.  And then number 7, do you see
23  number 7?
24  A.    Yes.
25  Q.    And whose role -- who does number 7,

Page 41

1  the proceduralist or the IR nurse?
2  A.    The nurse.
3  Q.    All right.  And then on the second
4  page, do you see where it says postprocedure?
5  A.    Yes.
6  Q.    And there are 10 items listed there?
7  A.    Yes.
8  Q.    Item number 1, can you read that to
9  yourself?
10  A.    Yes.
11  Q.    Is that an IR nurse's job?
12  A.    Yes.
13  Q.    Okay.  And how about number 2, reading
14  that to yourself, I guess that's
15  self-explanatory.  You would do that if the
16  proceduralist had not done that, correct?
17  A.    Correct.
18  Q.    Number 3 is self-explanatory.
19        Number 4, that's pretty
20  self-explanatory.  I don't have any questions
21  there.
22        Number 5?
23  A.    Yes.
24  Q.    What's the -- what's that stating
25  there?  So if outpatient, the patient is to be

11 (Pages 38 - 41)

1   observed by the ultrasound nurse?
2       Let me back up and ask a question.  As
3   the IR nurse, if it's an outpatient procedure,
4   are you responsible for observing the patient?
5   A.    Yes.
6   Q.    Okay.  Number 6, excuse me, that's
7   self-explanatory.
8       Number 7, Prepare lab specimens for
9   transport-if labs ordered.
10      Do you see that?
11  A.    Yes.
12  Q.    What role does the IR nurse play in
13  that?
14  A.    We identify the specimens.  We prepare
15  them to be sent to the lab, so we place those
16  lab specimen stickers on the tubes, and we have
17  to initial them, date them, and time them.  And
18  if they need that cytology, the cytology form
19  would be printed and placed with it, and then we
20  would send it through our TransLogic tube to the
21  lab.
22  Q.    What's a TransLogic tube?
23  A.    Oh, like a pneumatic tube.
24  Q.    Okay.  Number 8, do you see the number
25  8?

1   A.    Yes.
2   Q.    What's that?
3   A.    That is basically telling -- we have
4   biohazard bags that the specimens go in and with
5   the accompanied lab slips.  And those are the
6   tube numbers.  Those are Cedar Crest numbers.
7   That's the -- it has, like, a keypad where you
8   type in where the sample goes to.
9   Q.    Okay.
10  A.    So the lab must be number 7 and number
11  31.
12  Q.    Okay.  Number 9, do you see number 9?
13  A.    Yes.
14  Q.    Put 1 patient sticker on invasive --
15  what is that?  Quality assurance sheet?
16  A.    Yeah.
17  Q.    And have outpatient take tech aide scan
18  consent form into Epic.
19      What's number 9 telling the IR nurse to
20  do?
21  A.    Number 9 does not apply to Muhlenberg.
22  Q.    Okay.  And then number 10, Clean up the
23  Neptune.
24      Do you see that?
25  A.    Yes.

1   Q.    And that's the IR's responsibility?
2   A.    Yes.
3   Q.    Now, this document that we just went
4   over, based upon your experience, does that
5   fairly and accurately summarize the procedure
6   that's done at Lehigh Valley-Muhlenberg?
7   A.    Yes.
8   Q.    Is there anything on there that's
9   missing that you -- that you would characterize
10  as significant based on your experience?
11  A.    No.
12      MR. WILHELM:  All right.  Why don't we
13  take a five-minute break?  I think we're halfway
14  through, and we'll take five minutes at this
15  point.
16      (Short recess was taken.)
17  BY MR. WILHELM:
18  Q.    Ms. Unser, do you know Amanda
19  Lieberman?
20  A.    Yes.
21  Q.    And how do you know her?
22  A.    She is a physician assistant.
23  Q.    Where?
24  A.    That I work with.
25  Q.    Okay.

1   A.    Lehigh Valley Hospital.
2   Q.    And how long have you known her?
3   A.    About eight years.
4   Q.    Okay.  And approximately how frequently
5   do you work with her?
6   A.    Once a week.
7   Q.    Okay.  For a full day?
8   A.    Yes.
9   Q.    Do you have any contact with her or
10  socialize with her outside of work?
11  A.    No.
12  Q.    Okay.  Have you -- since you work with
13  her, have you had the opportunity to observe her
14  perform various procedures, medical procedures?
15  A.    Yes.
16  Q.    Okay.  And have you assisted on some of
17  those procedures?
18  A.    Yes.
19  Q.    Have you ever been asked by anybody at
20  Lehigh Valley to critique or evaluate her work?
21  A.    No.
22  Q.    Have you heard people talk about her
23  professional reputation and experience and
24  knowledge, et cetera -- strike et cetera.
25  That's bad.

1    transcript?
2    A.    No.
3    Q.    Other than your attorney, has anyone
4    told you what his deposition testimony was?
5    A.    No.
6    Q.    When's the last time that you saw him
7    and spoke with him?
8    A.    Two weeks ago.
9    Q.    Was that at work?
10   A.    Yes.
11   Q.    And do you have any interaction with
12   him outside of work?
13   A.    No.
14   Q.    Okay.  So Diane Helen Raymond is the
15   decedent in this case, the estate of Diane Helen
16   Raymond.  Do you know who she is?
17   A.    No.
18   Q.    Okay.  Do you know who Jack Raymond is?
19   A.    No.
20   Q.    Do you know if Diane Raymond was a
21   patient at Lehigh Valley-Muhlenberg at all?
22   A.    No.
23   Q.    You don't know or no, she was not a
24   patient?
25   A.    I guess I'm kind of -- I guess I'm

1    confused by the question.
2    Q.    Okay.  That's fine.  I'm going to --
3    let's do it this way.
4         You -- what do you know -- just
5    generally tell me what you know about Diane
6    Helen Raymond.
7         MS. WEED:  Object to the form.  You can
8    answer that.  Go ahead.
9         THE WITNESS:  I know of her because of
10   the paperwork.  I don't remember her per se.
11   BY MR. WILHELM:
12   Q.    Okay.  Right.  And you --
13   A.    If that's what you meant.
14   Q.    Okay.  That's fine.
15        And you -- so I'm going to represent to
16   you -- please accept these representations as
17   true -- that Ms. Raymond was a patient at Lehigh
18   Valley-Muhlenberg for a thoracentesis procedure
19   on March 8th, 2018.  Okay?
20   A.    Okay.
21   Q.    Now, based upon that and based upon the
22   fact that you were requested to have your
23   deposition taken, does that jog your memory at
24   all about Diane Helen Raymond?
25   A.    No.

1    Q.    Okay.  Have you looked at any records
2    from the hospital regarding Diane Raymond before
3    today?
4    A.    No.
5         (Unser Exhibit 2 was marked for
6    identification.)
7    BY MR. WILHELM:
8    Q.    So if you take a glance at Exhibit 2.
9    A.    Yes.
10   Q.    Do you know what Exhibit 2 is starting
11   at the -- toward the bottom of the page where it
12   says -- procedure by Amanda Lieberman?
13   A.    Yes.
14   Q.    Have you seen -- and then spilling over
15   to the next page?
16   A.    Okay.
17   Q.    Have you seen that document previously?
18   A.    No.
19        MS. WEED:  Scott, I need to clarify.
20   This was attorney-client, but she has seen her
21   records and I believe this report, and that's
22   it.
23        MR. WILHELM:  Okay.
24        THE WITNESS:  Uh-huh.
25        (Unser Exhibits 3 through 8 were marked

1    for identification.)
2    BY MR. WILHELM:
3    Q.    And then look -- take a quick look at
4    Exhibits 3 through 8.
5    A.    Okay.  Yes.
6    Q.    Would you agree that your name is
7    referenced on those exhibits?
8    A.    Yes.
9    Q.    And would you agree that those exhibits
10   appear to be some records related to
11   Ms. Raymond?
12   A.    Yes.
13   Q.    So this is more for -- this is for
14   clarification.  I'm not trying to pester you
15   here.
16        You do not have -- is it fair to say
17   you do not have any independent recollection of
18   providing care to Ms. Raymond on March 8th,
19   2018?
20   A.    Correct.
21   Q.    Okay.  Now, after looking at these
22   exhibits and speaking with your attorney, do you
23   acknowledge that you did participate as the IR
24   nurse during Ms. Raymond's March 8, 2018,
25   thoracentesis?

14 (Pages 50 - 53)

1    A.    Yes.
2    Q.    Ms. Raymond had a thoracentesis on
3  February 5, 2018.  Did you participate in that
4  procedure?
5    A.    Yes.
6       MS. WEED:  February -- listen to the
7  question.  It's a different date.
8       THE WITNESS:  Oh, okay.
9  BY MR. WILHELM:
10    Q.    Yes.  This is not a trick question.
11  I'm going to tell you this.  I don't believe you
12  participated in her February 5, 2018, procedure.
13    A.    Sorry.
14    Q.    That's okay.
15       Do you believe you did?
16    A.    No.
17    Q.    Okay.  So during this procedure, you
18  said you don't have any independent
19  recollection.  Do you know who --
20    A.    Correct.
21    Q.    Do you know who performed the
22  procedure?  We're talking March 8th.
23    A.    Looking at the paperwork, Amanda
24  Lieberman did.
25    Q.    And looking at the paperwork, you were

1  there, right?
2    A.    Yes.
3    Q.    Okay.  And based on any paperwork that
4  you've reviewed before today, do you know who
5  else, if anybody, was present during the
6  procedure?
7    A.    I don't remember.
8    Q.    Okay.  Do you know if Dr. Hoffman was
9  present during the procedure?
10    A.    I don't remember.
11    Q.    Okay.  So if I were to ask you -- if I
12  give you a task and you had to do this task and
13  I said go find out who else was in the procedure
14  room, if anybody, where would you look for that?
15    A.    I would look in -- in the chart.
16    Q.    Okay.  Is there any -- in Ms. Raymond's
17  medical chart, right?
18    A.    Yes.
19    Q.    Is there some other chart you would
20  look at?
21    A.    We have a logbook.
22    Q.    Okay.
23    A.    But -- and that would tell me who did
24  the procedure.
25    Q.    Okay.  And where is that logbook

1  located?
2    A.    At the nurse's desk.
3    Q.    Besides telling you what proceduralist
4  did the procedure, does it say what other
5  medical people -- anybody else who was
6  assisting?
7    A.    What was that last part?
8    Q.    Sure.  Besides saying who the
9  proceduralist is, does the logbook indicate who
10  else participated in it?  Like the IR nurse,
11  does it identify that person?
12    A.    Oh, no.  In our charting, we put who
13  was in the room.
14    Q.    Okay.  Where do you chart who was in
15  the room?
16    A.    Under the staff.  There's a staff tab
17  in our navigator.
18    Q.    And who is responsible for charting
19  that?  Is it the IR nurse or is it somebody
20  else?
21    A.    The nurse, the IR nurse.
22    Q.    Okay.  So have you looked at that
23  document before today to see who else was in the
24  room during this procedure?
25    A.    No.

1    Q.    Has anybody told you before today who
2  else was in the room?
3    A.    No -- you mean --
4       MS. WEED:  Other than your attorney.
5       THE WITNESS:  No.
6  BY MR. WILHELM:
7    Q.    All right.  So you believe your -- I
8  want to make sure I understand this because I'm
9  going to be making a request of your attorney --
10  that there is a logbook which will identify the
11  proceduralist who performed the procedure, and
12  then there is a staff tab which will identify
13  who else was in the room?
14    A.    Yes.
15    Q.    Okay.  So I will be making that formal
16  request to Ms. Weed.
17       MS. WEED:  And, Scott, can you send
18  that to me in writing?
19       MR. WILHELM:  I certainly will.  This
20  is something I've been chasing Good Shepherd for
21  for months, and I think Good Shepherd could
22  answer that question for me too, but they
23  haven't.
24  BY MR. WILHELM:
25    Q.    So I want you to take a moment to

15 (Pages 54 - 57)

*EXHIBIT "G"*

## LEHIGH VALLEY HOSPITAL
## *DEPARTMENT OF ULTRASOUND PROTOCOLS*

| SECTION | PROTOCOL | PAGE |
|---|---|---|
| | | |
| *Invasive Ultrasound* | Ordering Labs<br>Lab specimen protocol | 1 & 2 |
| | Lab Values/Medication Guidelines For Invasive Procedures | 3 & 4 |
| | Ankle Injection for Tarsal Tunnel Syndrome | 5 |
| | Compression of Pseudoaneurysm | 6 |
| | Hip Injection (iliopsoas bursa for medial snapping hip syndrome) | 7 & 8 |
| | Liver Biopsy (random) | 9 |
| | Liver Biopsy (mass) | 10 |
| | Lymph node/ Parotid Bx | 11 |
| | MSK injection for Pediatric Patients of Dr. Bingham | 12 |
| | Paracentesis | 13 & 14 |
| | Prostate Biopsy | 15 |
| | Renal Biopsy<br>Native & Renal Tx Biopsy | 16 & 17 |
| | Thoracentesis | 18 & 19 |
| | Thrombin injection | 20 |
| | Thyroid Biopsy | 21 |
| | Ultrasound guide pain injections with Dr. Patel | 22 |
| | Neptune – set up and docking protocols | 23 |
| | Canister setup and disposal protocol | 24 |
| | Basic sterile Bx tray setup and clean up protocol | 25 |
| | sterile Bx tray setup and clean up protocol for any type of neck bx | 25 |
| | Bx guide bracket cleaning protocol | 26 |
| | | |

EXHIBIT

ALL-STATE LEGAL®

1

## _THORACENTESIS:  suction regulator SHOULD BE set to: **100** MM MERCURY_
**Items needed prior to procedure:**

**Supplies:**    1- sterile tray
1- "short" yuehcentesis needle (5f, 7cm)
1- Pre-filled 10 ml buffered 1% Lidocaine syringe
1- 3 ml ChloraPrep
1- Marker-*one use only*
1- Neptune and Manifold – \*\**(4 canister roll stand and 6ft. of bubble tubing **only** if a Neptune is unavailable)*\*\*
1- Bubble tubing – (Neptune- *at least-half a bubble at one end, 1 full bubble in the middle and 1/2 of a bubble at the other end) (if Canisters - at least-half a bubble at one end/ 1 full bubble in the middle and 1/3 of a bubble at the other end)*
1- *5-1 connector* (Christmas tree tube adapter)
1- Connecting tube
2- 60 ml syringe- *if labs are requested*
1- Lab fluid transfer device- *if labs are requested*
1- purple top tube- *if labs requested*
2- red top tubes- (*number of tubes depends on labs requested*)
1- 100 ml sterile specimen cup
1- Small red trash bag

**Paperwork:**  Consent form/ Pt stickers/ Pt script *(script/Order will be in paper form, if from out of network provider and scanned into EPIC)*  Lab stickers and NON gyn cytology form *(from EPIC, if ordered)*

**EPIC Chart:**  normal PT, PTT, platelets, INR - *according to lab value and medication guidelines*/ Pt script (order) post orders will be entered in EPIC by the Radiologist/PA

**Patient Prep:**   Pt does not need to be NPO; stop blood thinners according to *lab value and medication guidelines*

**Procedure performed by:**   PA or Radiologist

**Other support staff:**   nurse to start an IV (if necessary)

## Pre Procedure:
1. Set up Neptune - \*\* *SEE NEPTUNE SET UP PROTOCOL ON PAGE 23* \*\* - (If a Neptune is unavailable, use the 4 canister roll stand system- \*\* SEE CANISTER SET UP PROTOCOL on page 24 \*\*)
2. Bring the patient into the room
3. Sit patient up on side of bed with arms resting on tray table *(if they are able to do so, otherwise patient will have to be rolled on the appropriate side)*
4. Go through the invasive check list in EPIC begin navigator.  Explain the procedure to the patient.
5. Scan patient's posterior chest and mark the lowest rib space with the location of largest area of fluid with marker.
6. Set up sterile tray, including dropping additional supplies as needed – wearing a surgical mask
7. Call the Radiologist and/or PA for procedure

## Procedure:
1. Ensure consent is filled out and signed after the Radiologist/PA explains the procedure to the patient.
2. Perform radiology time out in EPIC
3. All present to perform the procedure must wear a surgical mask
4. Assist Doctor/PA with drawing up lidocaine/ US tech will assist Doctor/PA during procedure as needed
5. Before hooking the tubing to the patient end of the sterile *5-1 connector* (Christmas tree tube adapter) /connecting tube setup *(Radiologist/PA should insure stopcock is in a "closed" position when hooking up to suction)*
6. Once the bubble tubing is connected to the patient, press *start suction* on the back touch screen, lower left, of the Neptune.
7. Tape the upper portion of the middle bubble in the suction tubing to the tray table *(or patient's stretcher side rail, if patient is rolled on their side.*

*Page 18*

## *THORACENTESIS – continued:*

**Post procedure:**

1. When done and catheter is removed from the patient, remove the manifold from the Neptune (by turning the manifold to the left) and throw the bubble tubing, connecting tube, connector and yuehcentesis catheter in the clear trash.
2. Clean and dress the patients puncture site, if the Radiologist/PA did not already.
3. Assist patient back on to the stretch or onto their back.
4. Patient will get a post thoracentesis ***chest x-ray (inspiration/expiration)****, if* patient exhibits symptoms concerning for a pneumothorax. The Chest x-ray would be ordered by Radiologist/PA. *If the chest X-ray is ordered before 3pm, the X-ray will be done portable in US Department. If ordered after 3pm, patient is to be transported to the X-ray department for the chest X-ray.*
5. If outpatient, the patient is to be observed by US nurse. If inpatient, the patient can be sent back to room following X-ray *(if X-ray done).*
6. Post-procedure orders will be entered by Radiologist/PA in EPIC
7. Prepare lab specimens for transport *–if labs ordered ***SEE LAB SPECIMEN PROTOCOL ON PAGE 2****
8. Tube specimens in biohazard bag with slips to rapid response (#7 or # 31) - *if labs drawn*
9. Put 1 patient sticker on invasive QA sheet and have outpatient tech aide scan consent form into EPIC
10. clean up/docking the Neptune - *** SEE NEPTUNE DOCKING PROTOCOL ON PAGE 23 *** - (If using the 4 canister roll stand system- ** SEE CANISTER DISPOSAL PROTOCOL on page 24 **)

**Miscellaneous: ***inpatients are transported back to floor for monitoring by floor nurse after Procedure. If chest x-ray is needed, patient will be transported after chest x-rays are cleared by a Radiologist**
 ***Neptune or wall suction level should be checked prior to connection for every patient****

*EXHIBIT "H"*



THE UNIVERSITY of
TENNESSEE UT
HEALTH SCIENCE CENTER

GRADUATE SCHOOL of MEDICINE

**Radiology Residency Program**
1924 Alcoa Highway
Knoxville, TN 37920
Office: 865-305-8685

May 24, 2021

Scott Wilhelm, Esq.
Winegar, Wilhelm, Glynn & Roemersma, P.C.
PO Box 800
305 Roseberry St.
Phillipsburg, NJ 08865

Re:  Estate of Diane Helen Raymond v Amanda Lieberman, et al
Civil Action:  20-CV-959 in the United States District Court for the Eastern District of
Pennsylvania

Dear Mr. Wilhelm,

I, Bradley Robert Pollard, JD, MD, am a licensed physician with board certification in
Interventional Radiology and Diagnostic Radiology.  I have been retained by the Plaintiff to
opine whether Amanda R. Lieberman, PA-C, followed the interventional radiology standard of
care in performing a thoracentesis in the above referenced case.

I am familiar with the standard of care for performing a thoracentesis by virtue of my education,
training, experience, and knowledge.

I have reviewed the following materials provided to me regarding the care of Diane Raymond:
(1) the depositions of Amanda Lieberman PA-C, Errin Hoffman, MD, Carin Minchew, PA-C,
Sandra Kentner, RN, Nancy Nieves, RT, Maureen Unser, RN, Carole Rottman, CRNP, Brandi
McMillian-Goodwin, RN, and John Raymond, (2) the Amended Complaint and Answers filed for
this case, (3) the Local Registrar's Certificate of Death For Diane Raymond, (4) the Autopsy
Report for Diane Raymond, (5) the Affidavits of Merit filed for this case, and (5) Medical Records
from Diane Raymond's care at Good Shepherd Specialty Hospital (GSSH) and Lehigh Valley
Hospital (LVHN) which are listed in Appendix A.

Diane Raymond was a 76-year-old female with multiple chronic medical conditions.  Her past
medical history included breast cancer, hypothyroidism, chronic obstructive pulmonary disease,
coronary artery disease, gastroesophageal reflux disease, hypertension, deep venous
thrombosis, decubitus ulcer, and carotid artery stenosis.  None of these medical conditions are
relevant to the standard of care for a thoracentesis in this case.  Furthermore, nothing in Ms.
Raymond's medical history precluded a thoracentesis if her treating providers believed a
thoracentesis was medically appropriate.

Ms. Raymond presented to Hunterdon Medical Center in December of 2017 where she was
found to have a myocardial infarction.  She was transferred to Morristown Medical Center for
definitive treatment with a coronary artery bypass with graft procedure.  After this procedure,
despite multiple attempts, she was unable to be extubated.  Ultimately, the decision was made
to perform a tracheostomy placement.  She was treated for ventilator dependent respiratory
failure until her death.  This care was primarily done at a long-term acute care facility, Good
Shepherd Specialty Hospital.

1

During the months preceding her death, Ms. Raymond was evaluated by pulmonary and critical care providers regarding treatment of her respiratory failure. Imaging obtained during this time demonstrated that Ms. Raymond at varying times had pleural effusions, pneumonia, and pulmonary edema. She underwent a right thoracentesis on 2/5/2018 which improved the right pleural effusion and was without known complication.

During her last stay at Good Shepherd, she was again seen by the pulmonary medicine team who indicated that she had a recurrent right pleural effusion. They suggested a repeat right thoracentesis. The order for the thoracentesis was placed. Nothing in the records indicate any concerns by her providers that she would be not able to tolerate the procedure.

On the morning of 3/8/2018, at approximately 0925 hours, Ms. Raymond was transported from GSSH to interventional radiology at Lehigh Valley Hospital accompanied by a nurse and respiratory therapist. The procedure notes report a right thoracentesis being performed from 0930-1009 hours. The procedure was performed by Amanda Lieberman, PA-C who reports that when she first tried to aspirate pleural fluid that she drew 50 cc of dark blood. She then reports that the fluid cleared with approximately 1000 cc of yellow fluid following the initial dark blood. There is some variation in the characterization of the aspirated pleural fluid. In reviewing the clinical notes and depositions listed above, the total amount of non-yellow pleural fluid was listed as 50-100 cc. The initial fluid was described by different people as dark blood, red, dark old blood, bloody fluid, and dark red blood. After seeing the initial fluid, Ms. Lieberman requested the nurse to ask the attending interventional radiologist, Errin Hoffman, MD, to come to the room. At the time of his appearance, the fluid had cleared to a yellow color. No additional interventions or changes to the procedure were made.

After the procedure, Ms. Raymond was transferred back to her room at Good Shepherd. She had a post procedure radiograph showing no pneumothorax or other complication. Initially, Ms. Raymond was in no acute distress after the procedure. At 1129 hours that morning, nurse practitioner Rauttmann, reports: "IR PA called to relate 50 cc of dark old blood was initially aspirated. Will monitor for signs or symptoms of hemothorax." At approximately 1145 hours, Ms. Raymond was noted to be lethargic with dizziness. A blood pressure was obtained with reading at 83/58.

By 1330 hours, her systolic blood pressures were as low as the 70s. She received a 750 mL fluid bolus and was placed in Trendelenburg position. At around the same time, a critical hemoglobin level was received which had been drawn after the procedure. The hemoglobin had decreased from 7.6 prior to the procedure to 5.7 after the procedure. The interventional radiology physician's assistant, Carin Minchew, was called by the ICU staff. She suggested getting an immediate CT scan. Providers at this time refer to her abdominal physical exam as distended and pale blue in color. A bedside ultrasound was performed reportedly demonstrating abdominal free fluid.

A rapid response was called at 1450 hours due to, among other things, hypotension, the drop in hemoglobin, and the lack of improvement of her blood pressure despite intervention. She was then transferred to the medical intensive care unit at LVHN arriving at 1544 hours. She was admitted by Daniel A. Schwed-Lustgarten with "post-operative hemorrhagic shock." At the same time, Wayne A. Martini, MD, an emergency medicine resident, wrote in the history and

2

physical that "in the setting of new acute onset anemia, worsening hypotension, blue distended abdomen following IR intervention with thoracentesis, patient most likely has to have a liver laceration or other source of intra-abdominal hemorrhage." Shortly thereafter, at approximately 1622 hours, Kina T. Hill-Francis, MD, records her impression of Ms. Raymond as "acute hypovolemic shock s/p left thoracentesis - presumed peritoneal bleed."

At 1640 hours, a code blue was started after Ms. Raymond deteriorated to pulseless electrical activity. At 1703 hours, she died after the code was ended without spontaneous return of circulation.

At approximately 2027 hours, Dr. Schwed-Lustgarten reports that the "clinical picture was consistent with hemorrhagic shock, iatrogenic, after right thoracentesis."

On the Certificate of Death dated 3/12/2018, the sole cause of death listed was: "Hemorrhagic shock." A limited autopsy was performed on 3/9/2018. The cause of death was deferred due to the limited autopsy. However, the autopsy did demonstrate a firm and tense abdomen. There was 400 mL of liquid hemorrhage within the liver parenchyma. There was a 350 gram clot over the anterior aspect of the right lobe of the liver. The total measured hemoperitoneum measured 750 mL. There were small volume hemothoraces measuring 50 and 100 mL on the right and left respectively.

With a reasonable degree of medical certainty, my opinions of this case address standard of care and causation. They are summarized as follows:

1. The standard of care for performing a thoracentesis by interventional radiology was violated in the thoracentesis performed by Ms. Lieberman.
2. Ms. Raymond's thoracentesis was not performed with live ultrasound. The thoracentesis was performed after marking the skin with ultrasound. However, Ms. Lieberman admits to not using live ultrasound for the procedure. Live ultrasound imaging during the procedure allows the operator to have direct visualization of exactly where the needle is going during entry. If live ultrasound is used, injury to adjacent organs can be excluded as the adjacent organs are visualized with the ultrasound. Not using live ultrasound for the procedure in this case is a violation of the standard of care.
3. Ultrasound was not used to evaluate the patient once blood or red fluid was seen during the thoracentesis. Ms. Lieberman states in her deposition that it was rare for her to have a physician present during a thoracentesis. She reports that physician presence was mainly during the training/credentialing process. Given this rarity of asking for a physician presence, the request for attending presence suggests a concern about the procedure that should have been further investigated. Ultrasound was in the room as it was used to mark the patient for the procedure. Ultrasound could have been used to evaluate the position of the thoracentesis catheter and the presence of any complication such as hepatic injury related to the procedure. The lack of further evaluation after the initial concern regarding the color of the thoracentesis fluid was a violation of the standard of care by both Ms. Lieberman and Dr. Hoffman.
4. Bleeding and damage to adjacent structures are known risks of the thoracentesis procedure. However, these risks are confined to the thoracic cavity. Iatrogenic injury

outside the thoracic cavity including the abdominal cavity during a thoracentesis is a violation of the standard of care.

5. The materials reviewed for this case are consistent with iatrogenic injury during the thoracentesis. The autopsy report identifies a significant amount of blood both in the liver and a blood clot adjacent to the liver. The liver is found within the right abdomen which is the same side as the thoracentesis performed in this case. There is no other plausible explanation to explain this bleeding. There is no history of recent trauma. There is no liver tumor. There is no other recent procedure performed to explain the bleeding. Pre-procedure liver laboratory values and imaging reveal no acute liver abnormality.

6. The vital signs, laboratory values, and clinical assessment of the providers of this case all are consistent with acute bleeding related to an iatrogenic injury from the thoracentesis. While initially stable, there was a progressive drop in the patient's blood pressure after the thoracentesis despite being given blood products, fluids, and medications to improve her blood pressure. There was an acute drop in the hemoglobin level when comparing this level before and after the procedure. Bedside ultrasound performed after the procedure demonstrated abdominal free fluid. Multiple clinicians report an acute clinical decline with a distended abdomen. The physicians in the ICU state Ms. Raymond most likely had abdominal/peritoneal injury after thoracentesis. The cause of death was listed as hemorrhagic shock.

7. I conclude, with a reasonable degree of medical certainty, that Amanda R. Lieberman's performance of an ultrasound-guided thoracentesis on Diane Helen Raymond on March 8, 2018, was not made in accordance with the medically-acceptable standard of care as she lacerated Mrs. Raymond's liver when she inserted the needle into Mrs. Raymond at the commencement of the thoracentesis procedure without employing live ultrasound.

I specifically reserve the right to amend or supplement this report if new information is revealed.

Respectfully,

Bradley Pollard, J.D., M.D.
Assistant Professor of Radiology
University of Tennessee Medical Center

Appendix A
Medical Records Reviewed from Good Shepherd Specialty Hospital and Lehigh Valley Hospital

1. Admission History and Physical, progress notes, consultations, and discharge summary from admission to Good Shepherd from 1/22/2018-02/05/2018.
2. Operative Notes related to an arterial line placement and right thoracentesis dated 2/5/2018.
3. Progress Notes from Good Shepherd from 2/9/2018-02/28/2018.
4. Laboratory values and imaging results from hospitalization at LVH from 2/28/2018-03/05/2018.
5. Discharge Summary from LVH Muhlenberg dated 3/5/2018.
6. Pulmonary progress notes by Carole Rottman from Good Shepherd dated March 6, March 7, and March 8 of 2018.
7. Additional typed and handwritten progress notes from Good Shepherd progress notes dated 3/5/2018-3/08/2018.
8. Operative Note from thoracentesis dated 3/8/2018 including attending attestation.
9. Procedural Flowsheets, Invasive Procedure Checklist, Pre-Incision Documentation, Procedural Documentation, Intake/Output, and Closing Documentation from the thoracentesis recorded by Maureen Unser dated 3/8/2018.
10. Interventional Radiology PA progress note after thoracentesis dated 03/08/2018 at 1450 including attending attestation.
11. History and Physical from admission to medical intensive care unit at LVH-Muhlenerg with attending attestation dated 3/8/2018.
12. Operative Note related to an arterial line placement dated 3/8/2018.
13. Significant event and code blue notes from 3/8/2018.
14. Chest radiograph dictation from 3/8/2018 at 1615.
15. Blood products request dated 3/8/2018.
16. Lehigh Valley Hospital Department of Ultrasound Protocols.
17. Operative Note for a thoracentesis dated 2/5/2018.

*EXHIBIT "I"*

1    A.    1981.
2    Q.    So from the time you graduated San Jose
3    State in '80 to '81, did you work in California?
4    A.    Yes.
5    Q.    And what did you do?
6    A.    I worked in the emergency room.
7    Q.    Okay.
8    A.    At Kaiser Permanente.
9    Q.    Okay.  And then you came here to
10   Pennsylvania, and where did you start working?
11   A.    Lehigh Valley Hospital.
12   Q.    Around 1981?
13   A.    Yes.
14   Q.    In what department?
15   A.    PACU -- not PACU, PCCU, progressive
16   coronary care.
17   Q.    What did you have to do to obtain your
18   Pennsylvania nursing license?
19   A.    Apply and then send them all the
20   transcripts and -- I don't know.  They go
21   between California and Pennsylvania.  I don't
22   know what they do.
23   Q.    When you applied, was your application
24   accepted on the first application?
25   A.    Yes.

1    Q.    Do you have to do continuing medical
2    education?
3    A.    Yes.
4    Q.    How frequently?
5    A.    Every two years.
6    Q.    How many hours?
7    A.    Thirty.
8    Q.    And has your continuing medical
9    education always been up-to-date in the last 40
10   years?
11   A.    Yes.
12   Q.    Do you belong to any professional
13   medical associations?
14   A.    Yes.
15   Q.    What are they?
16   A.    American Association of Critical Care
17   Nurses.
18   Q.    And how long have you been affiliated
19   with that association?
20   A.    1987.
21   Q.    Okay.  Any others?
22   A.    No.  No.
23   Q.    So taking you back then to 1981 when
24   you started at Lehigh Valley, was that a
25   full-time job?

1    A.    Yes.
2    Q.    And you were in the critical care unit,
3    correct?
4    A.    Progressive care unit when I started,
5    yes.
6    Q.    And how long were you in that unit?
7    A.    I don't know.  Six months, a year, I --
8    then I took the critical care course there, and
9    then I went to special care unit there and
10   worked there for a while.  I don't know.
11   Q.    I'm sorry.  Let me try and make this a
12   little bit more clear.
13        You started at Lehigh Valley in 1981.
14   How long did you work at Lehigh Valley?
15   A.    Oh, okay.  I worked there until 1989.
16   Q.    And then where did you go?
17   A.    Then I worked -- I worked -- I taught
18   nursing for a year at the School of Nursing -- I
19   should have brought my résumé.
20        And then I did agency for a year or
21   two, and then I worked at Sacred Heart Hospital
22   for about five years.  And then I went back to
23   Lehigh Valley Hospital and worked there until --
24   I worked there for about another five years from
25   '95 to 2000.

1    Q.    Okay.
2    A.    And then we moved back to California
3    for two years.  And then I -- when I came back
4    from California in 2001 -- well, 2002 I started
5    working here, and I've been here since 2002.
6    Q.    And here being Good Shepherd, correct?
7    A.    Good Shepherd, yes.
8    Q.    When you went back to California around
9    2000, 2001, did you work in the nursing field?
10   A.    Yes.
11   Q.    And, you know, you referenced a résumé.
12   Would you be kind enough after the deposition to
13   provide your résumé to your attorney?
14   A.    I guess.  I have to --
15        MR. WILHELM:  I'll make a --
16        MR. PITT:  She can -- she can send it
17   to the people that'll send it to me, so that's
18   fine.
19        MR. WILHELM:  Great.  Thank you very
20   much.
21        MR. PITT:  Thank you.
22   BY MR. WILHELM:
23   Q.    So you've been at Good Shepherd from
24   2002 to the present, correct?
25   A.    Yes.

1    Q.      And as an RN, and then in what
2    departments?
3    A.      Well, there's only -- this is the only
4    department there is.  This is it, yeah.
5    Q.      And what is that?  Critical care?
6    A.      We're an LTACH, so there are 32 beds.
7    That's it.
8    Q.      You said an LTACH?
9    A.      Long-term acute-care facility, so
10   that's all there is here.
11   Q.      Gotcha.  And is this on Schoenersville
12   Road?
13   A.      Yes.
14   Q.      And is that in the Lehigh Valley Health
15   Network building?
16   A.      Yes.
17   Q.      And Good Shepherd occupies two floors,
18   I believe?
19   A.      Yes.
20   Q.      The third and fourth floor?
21   A.      Yes.
22   Q.      And that's where you've worked for
23   these past 19 years?
24   A.      Yes.
25   Q.      And has that 19 years been

1    uninterrupted?
2    A.      Yes.
3    Q.      And it's been full time, right?
4    A.      Yes.
5    Q.      So tell me what you do on -- what your
6    typical job responsibilities are, if typical's a
7    good word for it.
8    A.      Well, I'm the supervisor, so usually
9    get report in the morning, check to make sure
10   everybody is getting through their assignments.
11   If anybody seems to need any assistance, then I
12   jump in and help them with that.
13       I take patients on transports to other
14   departments out of our unit.  They go on
15   transports to Lehigh Valley, I take the patients
16   on their transports because they're going to
17   another facility.  And then I cover for lunches.
18       Let's see, what else do?  I get report
19   from the nurses.  I just make sure the daily
20   operations are running smoothly.
21   Q.      Okay.  You said you're a supervisor.
22   Supervisor of what, the nursing staff?
23   A.      Yes.
24   Q.      And how long have you been the
25   supervisor?

1    A.      Well, officially I have been a
2    supervisor for about two years.  They used to
3    call it a charge nurse, and I was in that role
4    also.  But now they've changed that title to
5    supervisor and added on some more
6    responsibilities.
7    Q.      Okay.  And approximately how many
8    nurses are working there at Good Shepherd?
9    A.      I don't know.  Maybe about 80.  I don't
10   know total night shift and day shift.  I only
11   supervise the day shift weekday people and
12   the CNAs.
13   Q.      Now, you said you've been a supervisor
14   for about two years from this date, so around
15   2019 sometime?
16   A.      Yeah.  I guess, yeah.
17   Q.      So in March of 2018, which is a
18   relevant time period in this case, were you a
19   supervisory nurse at all?
20   A.      I think I was -- they were technically
21   calling it the charge nurse at that point, but
22   yes.
23   Q.      So you were a charge nurse in March of
24   2018?
25   A.      Yes.  Uh-huh.

1    Q.      Is your -- to your knowledge, is the
2    name of your employer Good Shepherd Specialty
3    Hospital or is it another name?
4    A.      It's Good Shepherd Rehabilitation
5    Hospital.  I guess that's technically the
6    employer.
7    Q.      On your pay stub, what is the name on
8    the pay stub?
9    A.      Good Shepherd Rehabilitation Hospital.
10   Q.      Okay.  Thank you.
11       Do you have a supervisor?
12   A.      I have the administrator.
13   Q.      The nursing administrator?
14   A.      Yes.
15   Q.      And who is that person?
16   A.      It would be Jessica Florkowski.
17   Q.      Can you spell that for the court
18   reporter?
19   A.      Let me get my phone so I can look.
20       MR. PITT:  She's got to look up how to
21   spell it.
22       THE WITNESS:  You know, to be accurate.
23       MR. PITT:  Right.  We respect that.
24   That's good.
25       THE WITNESS:  F-L-O-R-K-O-W-S-K-I.

Page 22

1  BY MR. WILHELM:
2  Q.      Thank you.
3          And how long has she been the
4  administrator?
5  A.      About two years.
6  Q.      Do you know who the administrator was
7  in 2018, around March of 2018?
8  A.      Andrew Martin.
9  Q.      Is Andrew Martin still employed by Good
10 Shepherd?
11 A.      No.
12         MR. WILHELM:  Terry, did you get the
13 exhibits?
14         MR. PITT:  No, I didn't get any.  My --
15 apparently my e-mail system at work is screwed
16 up.
17         MR. WILHELM:  Okay.  So you don't --
18         MR. PITT:  If you sent them today, I
19 didn't get them.  Once they come -- the one or
20 two that have come in today say it was sent at
21 4:00 today, so something's screwed up at my
22 office e-mail.  And I know they're working on
23 it, but I haven't gotten them.
24         Could you send them to another e-mail,
25 Scott?

Page 23

1          MR. WILHELM:  Yes.
2          MR. PITT:  Tmpitt48@gmail.com.
3          (Discussion held off the record.)
4  BY MR. WILHELM:
5  Q.      Ms. Kentner, do you know who Amanda
6  Lieberman is?
7  A.      Yes.
8  Q.      And how do you know her?
9  A.      She works at Lehigh Valley Hospital.
10 Q.      In what role?
11 A.      She's a PA in the interventional
12 radiology department.
13 Q.      Is that how you know her?
14 A.      Yes.
15 Q.      How long have you known her?
16 A.      I don't know.  She's worked there a
17 couple years.
18 Q.      A couple.  What do you mean by a
19 couple?
20 A.      Two or three years.
21 Q.      Did you know her before she started
22 working there?
23 A.      No.
24 Q.      If I asked you to describe her, would
25 you be able to describe her?

Page 24

1  A.      Yeah.
2  Q.      Have you ever seen her outside of work?
3  A.      No.
4  Q.      How frequently do you see her at work?
5  A.      Infrequently, yeah.
6  Q.      Can you describe infrequently?
7  A.      Couple times a year.
8  Q.      What floor is the interventional
9  radiology department?
10 A.      Second floor.
11 Q.      Has that been the case at least since
12 March of 2018?
13 A.      Yes.
14 Q.      Is that where you have seen
15 Ms. Lieberman, on the second floor?
16 A.      Yes.  Yes.
17 Q.      Have you seen her on the third or
18 fourth floors?
19 A.      No.
20 Q.      Have you ever worked with her on a
21 patient specifically?
22 A.      Just for a procedure.
23 Q.      So you have.  Can you give an estimate
24 as to how many times you've worked with her?
25 A.      You know, I'm going to say maybe 10.

Page 25

1  10 times.
2  Q.      From the time that she started to the
3  present, is that --
4  A.      Yes.  Yes.
5          MR. PITT:  Scott, I received them.
6          MR. WILHELM:  Okay.  So just quickly,
7  we're going to go back to Exhibit 1, if you
8  could just show her Exhibit 1.
9          MR. PITT:  Sure.  She has it on my
10 phone in front of her.
11         (Exhibit 1 was marked for
12 identification.)
13 BY MR. WILHELM:
14 Q.      On Exhibit 1 on the second page, it
15 appears to be your name on a signature sheet.
16 Is that your name?
17 A.      Yes.
18 Q.      And that's your role, correct, RN?
19 A.      Yes.
20 Q.      And are those your initials and your
21 signature?
22 A.      Yes.
23 Q.      Thank you.
24         When you say you worked on procedures
25 with Ms. Lieberman, what role do you play?

7 (Pages 22 - 25)

*EXHIBIT "J"*

1   and 7 a.m.  And she told me that -- she
2   asked me to give verbal approval over the
3   phone for another thoracentesis.
4   Q.    And were you told why the thoracentesis
5   was needed?
6   A.    No.
7   Q.    Earlier you had testified that the
8   previous thoracentesis your wife had had was
9   because there was fluid near her lung.  Is
10   that correct?  Did I understand that
11   correctly?
12   A.    Where did you say it was?
13   Q.    That she had fluid, well in the pleural
14   area.
15   A.    I was -- I did not -- I did not recall
16   ever hearing that word.  They would always
17   say abdomen or chest.
18   Q.    Okay.  Were you told that your wife was
19   having any breathing problems?
20   A.    This, the day of the -- this phone call,
21   you mean?
22   Q.    Yes.  The day of the phone call for the
23   consent.
24   A.    She didn't go into any details.  She
25   just said that we needed a verbal approval

1   ASAP for another thoracentesis.
2   Q.    And did you go with your wife to the
3   thoracentesis procedure?
4   A.    Not -- yes.
5   Q.    I'm sorry.  I was unclear on your
6   testimony.  Was that a yes, you went with
7   her to the procedure itself?
8   A.    Yes.
9   Q.    Yes?  And what time was that that you
10   went with her to the procedure?
11   A.    I'm going to guess -- I'd say roughly
12   between 9 and 10.
13   Q.    And where was the procedure?  If you can
14   recall?
15   A.    I have no idea.  I don't know.
16   Q.    Okay.  Did you go to Good Shepherd prior
17   to the procedure and then go from Good
18   Shepherd to the interventional radiology
19   area?
20   A.    Yes.
21   Q.    Is that a yes?
22   A.    Yes.
23   Q.    So if I'm understanding the sequence
24   correctly, you gave verbal consent on the
25   phone and then you came to Good Shepherd

1   that morning.  Is that correct?
2   A.    Yeah.
3   Q.    And was anyone else with you that day
4   from the family?
5   A.    I know Ginny came, but I believe she --
6   she came after my wife came back.
7   Q.    Okay.  Now, when you went with your wife
8   for the thoracentesis procedure itself, were
9   you just sitting in a waiting room while she
10   got the procedure?
11   A.    I remember sitting on the bench outside
12   of her room.  I don't remember where it was.
13   Q.    Did you see the procedure at all?
14   A.    No.
15   Q.    As it was being done?
16   A.    No.
17   Q.    When you had given your consent for the
18   procedure, was the consent read to you over
19   the phone?
20   A.    No.
21   Q.    When you arrived at Good Shepherd, did
22   you then see this document?
23   A.    No.
24   Q.    Meaning Exhibit 1.
25       How long were you waiting on the bench

1   during the thoracentesis procedure?
2   A.    I didn't keep track of the time, to be
3   honest with you.  It would be a guess.
4   Q.    An educated guess is fine.  Do you think
5   it was more than one hour or two hours that
6   you were there?  Four hours?  Could you give
7   me any type of --
8   A.    I would guess maybe an hour.  Plus.
9   Q.    After the procedure, did you notice any
10   change in your wife's condition?  And by
11   after I mean immediately after.  When she
12   came out of the procedure, before you went
13   back to Good Shepherd.
14   A.    We really didn't communicate until she
15   got back into her room.
16   Q.    And your wife, as we've established, was
17   still on a ventilator and she had a trach at
18   this point.  Correct?
19   A.    Yes.
20   Q.    Okay.  So she was not able to verbally
21   communicate with you.
22   A.    Correct.
23   Q.    When you got back to the room -- I mean
24   referring to the room at Good Shepherd.  Is
25   that correct?

Page 114

1  visit your wife while she was in Good
2  Shepherd, that you know of?
3  A.   I don't believe so, no.
4  Q.   Okay.  Now, you've talked about a Nurse
5  Lindsay.  Was Nurse Lindsay at Good
6  Shepherd?
7  A.   Yes.
8  Q.   Do you remember any conversations you
9  had with her that you haven't already told
10  us about?
11  A.   Not that I can recall.  I know she was
12  very concerned that day.  And she reacted
13  accordingly.
14  Q.   Did you like nurse Lindsay?
15  A.   Yes.
16  Q.   Are there any other nurses that you
17  spoke with at Good Shepherd that you
18  remember their names as you sit here today?
19  A.   All of the nurses were excellent.  I
20  don't remember their names.  The only one
21  that I -- that really sticks in my mind is
22  Lindsay because she was there the last day.
23  Q.   Understood, understood.
24     Now, after your wife's death, did you
25  ever have any conversations with anyone

Page 115

1  associated with Good Shepherd?
2  A.   No.
3  Q.   That you remember.
4  A.   No.
5  Q.   Is that a no?
6  A.   No.
7  Q.   Okay.  Sorry.  I interrupted you.  I
8  apologize for that.
9     Now, just so I'm clear, on the
10  March 8th, I guess, when your wife came back
11  from Lehigh Valley Hospital to Good Shepherd
12  and then back to Lehigh Valley Hospital, did
13  Dr. Martini, was he associated with which
14  institution?  Good Shepherd or Lehigh
15  Valley?
16  A.   Lehigh Valley.
17  Q.   If you know.
18  A.   Lehigh Valley.
19  Q.   Okay.  Thank you.
20     Are there any other doctors, whether
21  they were associated with Good Shepherd or
22  Lehigh Valley, that you spoke with on the
23  day your wife died that you haven't told us
24  about today?
25  A.   Not -- no.

Page 116

1  Q.   Okay.  All right.
2     Sir, those are all the questions I have.
3  And I appreciate your time, and I'm sorry
4  for your loss.
5  A.   Thank you.
6           *   *   *
7        EXAMINATION
8  BY MS. WEED:
9  Q.   Mr. Raymond, I just have a couple of
10  follow-up questions.
11     Mr. Raymond, do you have any criticism
12  of Dr. Martini's care of your wife?
13  A.   No, I don't.
14  Q.   And earlier, Ms. Shannon had asked you
15  about whether you had --
16        MS. WEED:  Well, let me strike
17  that.
18  Q.   Earlier Ms. Shannon had asked you as far
19  as where you went location-wise when you
20  went to -- when your wife got the
21  thoracentesis.  And you had testified that
22  you did not go outside.
23     Do you recall that testimony?
24  A.   Say that one again, please?
25  Q.   Earlier, when you were asked by

Page 117

1  Ms. Shannon as to a location of where the
2  thoracentesis procedure took place, that you
3  did not go outside to get to that room.
4     Do you recall that testimony?
5  A.   Yes.
6  Q.   Okay.  Was it in the same building as
7  Good Shepherd?
8  A.   I know it was connected by a long
9  corridor.  But -- they're connected, yes.
10  But the same building, no.
11  Q.   Okay.
12  A.   They're two separate buildings connected
13  by a walkway.
14  Q.   Okay.  That's -- that's very helpful as
15  far as your description.
16     With respect to the ICU at Lehigh Valley
17  Hospital Muhlenberg, did you have to go to a
18  separate building when your wife was
19  admitted to the ICU?
20  A.   I went into a separate entrance, yes.
21  Q.   Did you go outside to get into the ICU?
22  A.   No.
23  Q.   So these buildings are all connected by
24  corridors, is the way you are describing it.
25  Am I understanding that correctly?

Page 118

1  A.    Well when she was in ICU, I went in one
2  exterior entrance.  And when she was in Good
3  Shepherd, I went in another one.
4  Q.    So they are separate.  They are separate
5  buildings.  Is that correct?
6  A.    Yes.
7  Q.    Okay.  Thank you.
8         MS. WEED:  Those are all the
9  questions I had.
10        THE COURT REPORTER:  Mr. Wilhelm,
11  do you have questions?
12        MR. WILHELM:  I do not, but maybe
13  Ms. Shannon does.
14        MS. SHANNON:  Did I miss
15  anything, Scott?
16        MR. WILHELM:  We can talk about
17  that another time.
18        MS. SHANNON:  I do not have any
19  other questions.
20        MR. WILHELM:  Okay.  Thank you.
21  Jack, we're done.  Just sit tight
22  for a few moments while we clean up, we do
23  some housecleaning over here.
24        THE WITNESS:  Okay.  Thank you
25  very much.

Page 119

1         MR. WILHELM:  Thanks again.
2         THE VIDEOGRAPHER:  The time is
3  1:44 p.m.  We are now off the record.
4              - - -
5         (Witness excused.)
6              - - -
7         (Deposition concluded at 1:44 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 120

1
2         C E R T I F I C A T E
3
4      I do hereby certify that I am a Notary Public
in good standing, that the aforesaid testimony was
5  taken before me, pursuant to notice, at the time
and place indicated; that said deponent was by me
6  duly sworn to tell the truth, the whole truth, and
nothing but the truth; that the testimony of said
7  deponent was correctly recorded in machine
shorthand by me and thereafter transcribed under
8  my supervision with computer-aided transcription;
that the deposition is a true and correct record
9  of the testimony given by the witness; and that I
am neither of counsel nor kin to any party in said
10 action, nor interested in the outcome thereof.
11     WITNESS my hand and official seal this 23rd
day of December, 2020.
12
13  _Sabrina D'Agostino_
14 ------------------------
15 Sabrina D'Agostino, RPR, CSR
Notary Public
16
17
18
19
20
21
22
23
24
25

Page 121

1        INSTRUCTIONS TO WITNESS
2     Please read your deposition over carefully
3  and make any necessary corrections.  You should
4  state the reason in the appropriate space on the
5  errata sheet for any corrections that are made.
6     After doing so, please sign the errata sheet
7  and date it.
8     You are signing same subject to the changes
9  you have noted on the errata sheet, which will be
10 attached to your deposition.
11     It is imperative that you return the
12 original errata sheet to the deposing attorney
13 within thirty (30) days of receipt of the
14 deposition transcript by you.  If you fail to do
15 so, the deposition transcript may be deemed to be
16 accurate and may be used in court.
17
18
19
20
21
22
23
24
25

31 (Pages 118 - 121)